**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| INMAR, INC. and COLLECTIVE BIAS, INC., | |
| Plaintiffs, | Case No.: |
| -v- | Judge: |
| MONICA MURPHY VARGAS and MLW SQUARED, INC. d/b/a AHALOGY, | JURY TRIAL DEMANDED |
| Defendants. | |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiffs Inmar, Inc. ("Inmar") and Collective Bias, Inc. ("Collective Bias") (together "Plaintiffs") file this Complaint for Injunctive and Other Relief against Defendants Monica Murphy Vargas ("Murphy") and MLW Squared, Inc. d/b/a Ahalogy ("Ahalogy," and together with Murphy, "Defendants").

**NATURE OF THE ACTION**

1. This is a case about a former employee violating her non-compete, non-solicitation, and non-disclosure of confidential information agreements with her former employer; stealing from that former employer; and her new employer assisting, encouraging, and benefitting from that former employee's unlawful conduct.

2. Defendant Murphy was an employee of Plaintiffs for approximately two years, during which time she had access to and made use of Plaintiffs' confidential and proprietary information in the course of her employment. Consequently, she was asked, and agreed, to be bound by contracts with Plaintiffs that required her to maintain the confidentiality of that information during and after her employment. Plaintiffs have learned, however, that notwithstanding those

1

agreements, Defendant Murphy stole that information and used it for her own benefit and that of her new employer, Defendant Ahalogy.

3. Furthermore, Defendant Murphy also promised that if she left the employment of Plaintiffs, she would not immediately go to a competitor or attempt to steal Plaintiffs' clients. Plaintiffs have learned that Defendant Murphy violated those promises, too—after she left Plaintiffs, she accepted a position at Defendant Ahalogy (a company she knew was a direct competitor of Plaintiffs) and began stealing and attempting to steal Plaintiffs' confidential and proprietary information and clients.

4. In sum, Defendants Murphy and Ahalogy have engaged in a systemic and unlawful effort to undermine Plaintiffs' business. Plaintiffs are entitled to an injunction to stop this activity, and damages to compensate them for it.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Count One is brought pursuant to the federal Defend Trade Secrets Act and Count Five is brought pursuant to the federal Computer Fraud and Abuse Act, and pursuant to 18 U.S.C. § 1836(c), which provides that "[t]he district courts of the United States shall have original jurisdiction of civil actions brought under [the Defend Trade Secrets Act]."

6. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because Counts Two through Four and Counts Six through Ten are together related to and form part of the same case and controversy as Counts One and Five.

7. The Court has personal jurisdiction over the Defendants.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and a substantial part of property that is the subject of the action is situated in this District.

## PARTIES

9. Plaintiff Inmar is a North Carolina Corporation. Its primary place of business and corporate headquarters is located at 635 Vine St., Winston Salem, North Carolina.

10. Plaintiff Collective Bias is a Delaware Corporation. Its primary place of business and corporate headquarters is located at 1750 S. Osage Springs Dr., Rogers, Arkansas. It is a subsidiary of Inmar.

11. Defendant Murphy is an individual and resident of Illinois.

12. Defendant Ahalogy is a Delaware Corporation. Its primary place of business and corporate headquarters is located at 3197 Linwood Ave., Cincinnati, Ohio.

## FACTS

**Collective Bias and its Business**

13. Collective Bias is an influencer marketing company based in Arkansas with other offices and employees in San Francisco, Minneapolis, Chicago, Cincinnati, and New York City. It was one of the first companies to enter the modern influencer-marketing space in 2009, and it is a leader in modern influencer marketing and its measurement.

14. Influencer marketing is a form of marketing where a seller leverages the popularity and credibility of specific individuals to market a product in a testimonial manner.

15. Traditional influencer marketing often took the form of celebrity endorsements of products in marketing and advertising materials, wherein a celebrity (presumed to be influential

based on that celebrity) received payment to endorse a product, and that endorsement was placed in traditional mass media (a television advertisement or a magazine).

16.  Modern influencer marketing, however, eschews that model in favor of using a broader array of individuals who wield measurable influence (through "likes" and "followers", for example) on a broader array of platforms, particularly social media (such as Facebook, Instagram, Twitter, Snapchat, Pinterest, YouTube, and various blogs).

17. Traditional influencer marketing is relatively simple; it might involve filming a television commercial in which a celebrity endorses a product that the celebrity is seen using (such as Lucille Ball and Desi Arnaz endorsing Phillip Morris brand cigarettes during the I Love Lucy television program).[1]  The message is simple: someone famous, wealthy, or attractive (and likely all three) uses the product, and if you want to be famous, wealthy, and/or attractive (or perceived as such), you should use the product, too.

18. Much of modern influencer marketing, on the other hand, is more complex and the message involves more substance: the premise is that someone who is a lot like you (i.e., who shares your background, interests, and/or lifestyle) shows you that they use a product, explains how and why they use that product in their everyday life, and explains how and why you might want to, too.  Modern influencer marketing also often uses dozens of influencers for a particular campaign as opposed to using a single celebrity endorser.

19. For example, http://millionmoments.net is a blog written by "Jess," who describes herself in part as follows:

> I'm Mama to Judah and Kaia, two crazy kids that rock my world.  I'm a huge DIY fan who loves working with my hands. My garden is my pride and joy, my camera goes just about everywhere I go.  A Million Moments is a blog about family, food, crafts, travel, and all things creative with an emphasis on stellar photography.  I am

---

[1] https://www.youtube.com/watch?v=z1ALtcAO69M

passionate about vegetarian cooking and providing a full, natural and fun life for my kids the best way I know how. We live a laid back life, we love the outdoors, and trying new things is deeply important to us.[2]

20. When a Collective Bias client wanted to promote its products through influencer marketing, Collective Bias coordinated with Jess and influencers like her, and Jess and those other influencers authored blog posts explaining what they liked about the product and ways to use the product (in Jess's case, by providing step-by-step instructions for creating a gift basket featuring the product).[3]

21. This type of marketing activity is much more targeted and its impact much more measurable. To be most effective, it requires (i) a detailed understanding of the sellers' business and product or service being offered (in order to identify influencers who might be interested in the product or service and able to credibly represent their interest in and use of the product) and (ii) familiarity and relationships with many thousands of influencers and an understanding of their followers (in order to identify which would most effectively reach buyers of the product or service).

22. In order to sell one's influencer marketing services effectively, one must also research and develop contacts among the sellers and have a thorough understanding of their business and marketing plans and priorities.

23. Collective Bias has spent years and millions of dollars not only developing the knowledge of products and influencers in order to offer the best services to its clients, but also

[2] http://millionmoments.net/about

[3] http://millionmoments.net/2013/12/adorable-last-minute-diy-gift-bigelow-tea.html

developing contacts at major brands and building dossiers regarding those brands in order to most effectively sell its influencer marketing services to those brands.

24. For example, Collective Bias has invested significant time and money in developing its Social Fabric® community, Shopper Social Media™ platform, and Prescriptive IQ™ platform.

25. Social Fabric® is a technology platform that was created using proprietary research strategies to help Collective Bias identify influencers for particular products and services, as well as to provide opportunities for those influencers.

26. Shopper Social Media™ is a technology platform that leverages a variety of data points (including data generated by Social Fabric®) to improve efficiency and effectiveness of influencer marketing efforts.

27. Prescriptive IQ™ is a platform that analyzes and synthesizes purchase data from Inmar, social data, market research, and engagement data in order to generate a marketing strategy recommendation (i.e., which influencers to use in order to ensure that the campaign reaches the right audience with the right content in the right place at the right time).

28. These services were built with proprietary research and they use proprietary methods to harness the power of consumer recommendation and endorsement across thousands of websites and millions of social media connections to connect authentic, real-life influencer content with key audiences using advanced analytics and behavior tracking. These platforms (along with the data gathered to build them and the data gathered through them) set Collective Bias apart from its competitors by enabling it to provide services and insights at a level that its competitors cannot.

**Collective Bias Hires Defendant Murphy**

29. On or about November 19, 2015, Defendant Murphy accepted an offer of employment with Collective Bias to serve as its Senior Director of Business Development.

30. In exchange for the offer of new employment, Defendant Murphy was asked to (and agreed to) sign an employment agreement (the "Employment Agreement"), a copy of which is attached hereto as Exhibit A and incorporated herein by reference.

31. Following execution of the Employment Agreement, Defendant Murphy became a fulltime employee of Collective Bias.

32. To facilitate the performance of her duties, Defendant Murphy was issued a keycard to access Collective Bias's secure facilities, issued a laptop computer on which to conduct business, and provided with an email account and login credentials that provided her access to Collective Bias's interstate computer network. Defendant Murphy's duties included using that laptop, email account, login credentials, and interstate computer network to communicate with Collective Bias's employees, clients, and prospective clients, all of whom are and were at all relevant times located nationwide.

33. As the Senior Director of Business Development, Defendant Murphy had numerous responsibilities, including:

    a. Being an expert on all things social media, Collective Bias history, product offerings, positioning, pricing, and competitor differences;

    b. Developing, managing, and tracking a territory/account plan to meet quarterly and annual sales goals;

c.  Effectively prospecting potential clients through personal consumer packaged goods, retail, agency, and supplier networks and other lead sources (including cold calling);

d.  Understanding client business objectives, proposing and closing strategic solutions leveraging Collective Bias products, rate card, budget template, and timeline standards;

e.  Retaining existing business and continually searching for ways to grow that business;

f.  Utilizing salesforce.com for prospect tracking, opportunity identification and internal communication;

g.  As the primary sales conduit for assigned clients, attending kick-off, post-analysis and other important meetings with clients as a means to sell additional Collective Bias services; and

h.  Collaborating with specified Client Services teams to oversee accounts from proposal through post-analysis to resell.

34. In that role, Defendant Murphy had access to and made use of Collective Bias's property and its confidential and proprietary information, including information regarding Collective Bias's product offering, positioning in the market, pricing, competitive differentiators, territory and account plans, lead sources, client business objectives, rate cards, budget templates, timeline standards, business opportunities, client lists, decision-maker contact information, and research dossiers.

35. Defendant Murphy also had access to the propriety aspects of the Social Fabric®
community, Shopper Social Media™ platform, and Prescriptive IQ™ platform, and used that
information in the performance of her duties.

**Inmar Acquires Collective Bias**

36. Inmar is a technology and data science company with offices throughout the United
States that provides insights and solutions to the following groups:

    a. to manufacturers to help them engage shoppers, optimize logistic efficiencies, and
      protect assets;

    b. to retailers to help them drive traffic, maximize storewide profitability, and reduce
      unsaleable products;

    c. to hospitals, health systems, and pharmacies to help them enhance operations,
      protect profitability, and improve patient outcomes;

    d. to government agencies to help them handle their revenue recovery, inventory
      management, business analytics, and consumer technology programs; and

    e. to shoppers to help them access promotions, care for their families, and live
      healthier lives.

37. In or around December 2016, Inmar acquired Collective Bias. After the transaction,
Collective Bias retained its name and continued to operate as its own entity, but its employees
were required to sign another agreement with Inmar—the Confidential and Proprietary Rights
Assignment Agreement (the "CAPRAA").

38. In exchange for employment with Inmar and the additional benefits associated
therewith, Defendant Murphy was asked, and agreed, to sign the CAPRAA, a copy of which is
attached hereto as Exhibit B and incorporated herein by reference.

39. Defendant Murphy continued to have access to and use Collective Bias's property and its confidential and proprietary information, but now also had access to and used Inmar's property and confidential information.

**Ahalogy and its Business**

40. Ahalogy, like Collective Bias, is an influencer marketing company. It describes itself as a company that "deliver[s] proven [return on investment] through category trend data, authentic influencer content, and social optimization technology."[4]

41. Ahalogy engages in the same form of modern influencer marketing as does Collective Bias. For example, Ahalogy highlights on its website a program it implemented for a client, explaining: "When it comes to inspiring readers with one-of-a-kind recipes and new ways to use their favorite products, influencers do it best. See how our Partners helped drive awareness of 7UP at Target with our data-driven Brandables solution. The seasonal cocktail recipes were inspired by ingredient trend data discovered in Muse."[5]

42. One of those cocktail recipes was authored by "Madison" on her blog https://www.joyfullymad.com, who describes herself as follows:

> Hey y'all! Welcome to A Joyfully Mad Kitchen, I'm so glad you found this space! I'm Madison and I am the recipe developer, taste-tester, food photographer, and writer behind this blog.
> . . . .
> On this blog you'll find the tried and true recipes that my family and I eat and love to serve to friends and family. Each of the recipes on this blog is food that we actually eat in our house. With a toddler in our family, I'll always try to share recipes that the whole family will enjoy – but I won't blame you if you hide the cupcakes from your kids. I get it. ;)[6]

---

[4] http://www.ahalogy.com/about

[5] http://www.ahalogy.com/muse

[6] https://www.joyfullymad.com/about-me/

43. The blog post on A Joyfully Made Kitchen that Ahalogy coordinated explained what Madison liked about shopping at Target and why she used 7Up in her recipe (and provided step-by-step instructions for creating a Cherry Sorbet Bellini party cocktail).[7]

44. Ahalogy touts its own propriety services "Muse" and "Brandables," and claims that "Muse is the only place to find influencer trend data."[8]

45. Ahalogy also expressly compares itself to Collective Bias when pitching new clients, claiming that in a competition between the two, "Ahalogy wins" because its products are supposedly more effective in reaching potential consumers.

46. Ahalogy also offers products and services that compete with Inmar's products and services, claiming to have access to significant amounts of data that permit it to advise on engagement with shoppers and help retailers drive traffic and maximize storewide profitability.

**Defendant Murphy Leaves Plaintiffs for Ahalogy**

47. Defendant Murphy knew that Ahalogy was a direct competitor of Plaintiffs—she was told precisely that by another employee of Plaintiffs. Indeed, she publicly admitted in January 2018 that she has been in the same line of work for the last five years: influencer marketing.[9]

48. Nevertheless, on or about July 12, 2017, and for the express purpose of discussing potential employment at Ahalogy, Defendant Murphy authorized a recruiter from a talent firm called Hunt Club to contact her at the work email address provided to her by Collective Bias.

49. Indeed, when she authorized the recruiter to reach out to her, Defendant Murphy knew that the recruiter was reaching out regarding the position of Director of Sales – West at Ahalogy,

---

[7] https://www.joyfullymad.com/cherry-sorbet-bellini/

[8] http://www.ahalogy.com/muse

[9] http://www.ahalogy.com/blog/the-new-ahalogists-were-expanding-our-team-in-cincinnati-3

and she knew that the role would entail leading sales efforts to grow Ahalogy's influencer and

content marketing business: the email she received included a detailed job description.

50. The job description and qualifications for the role at Ahalogy that Defendant Murphy

received is nearly identical to the job description for the role she held at Collective Bias (copies

of which are attached as Exhibits C and D):

> Collective Bias: A Director of Business Development builds relationships and
> closes business for Collective Bias. This position will ideally be part "hunter"/part
> "strategist". Typical clients consist of shopper marketing budget holders at brands
> (primarily CPG), brands themselves, retailers and agencies. Direct contacts are
> usually at senior manager/director level positions, but also include VP/CMO. A
> Director of Business Development at CB should have an entrepreneurial spirit, be
> a good listener, lean in mentality and be passionate about social media.

> Ahalogy: As a Sales Director at Ahalogy you will lead all sales efforts to grow their
> influencer and Content Marketing business with large brands and agencies in the
> Western region. Sales Directors are the backbone of each region, acting as the first
> line of offense in territory account acquisition. The focus of the role is on opening
> new relationships and delivering a growing amount of RFP opportunities from the
> agencies and brands you have met with. You will be supported by strong, dedicated
> SDR and Client Success resources, which help secure meetings and deliver
> proposals.

51. Likewise, the description of duties and qualifications overlap, with some examples

highlighted below:

| **Ahalogy** | **Collective Bias** |
|---|---|
| "Fluency in digital media vernacular with a deep interest in native social platforms (e.g., Pinterest, Twitter, Facebook)" | "Be an expert on all things social media" and "knowledge and understanding of social media platforms" |
| "Act as a first line of offense for product demos, proposals, pricing" and "evangelize the Ahalogy solution" | "Be an expert on . . . product offering, positioning, pricing, and competitor differences" |
| "Prospect within the Western territory" | "Effectively prospect potential clients" |
| "Meet and exceed individual and team revenue targets" | "Develop, manage, and track a territory/account plan to meet quarterly and annual sales goals" |

| | |
|---|---|
| "Experience routinely closing five and six-figure contracts" | "Proven ability to identify and close $100K+ deals" |
| "Preferred experience with CPG and Retail Brands, and Shopper marketing experience" | "Typical clients consist of shopper marketing budget holders at brands (primarily CPG), brands themselves, retailers and agencies" |

52. Shortly thereafter, Ahalogy interviewed Defendant Murphy and eventually offered her the role of Director of Sales at Ahalogy. Their reasoning for doing so was clear in their job description—if the Director of Sales was to be the "first line of offense," there could be no better weapon than an employee who held that same role at their main competitor.

53. Defendant Murphy did not inform Plaintiffs of her impending departure until early evening on August 24, 2017.

54. After accepting the offer from Ahalogy but prior to notifying Plaintiffs, Defendant Murphy, for her own personal benefit and for the benefit of Ahalogy, accessed and collected Plaintiffs' confidential information using her credentials to access Plaintiffs' computer systems and facilities, her work-issued computer, and her Collective Bias email account. Those actions included (but were not limited to) sending the following information to her personal email account:

   a. On August 4, 2017, Defendant Murphy forwarded an internal email from earlier that day containing (i) the names and contact information for decision-makers at a client, (ii) an explanation of the service Plaintiffs were offering and how the service worked, and (iii) a summary of Plaintiffs' discussions with the client and the business development plans for this client.

13

b.  On August 14, 2017, Defendant Murphy forwarded an internal email from earlier that week containing research conducted by Plaintiffs regarding the nationwide distribution of brand names for a client and discussing how this research would be helpful for more accurate targeting.

c.  Later that same day, Defendant Murphy forwarded another internal email from earlier that week containing (i) research conducted by Plaintiffs regarding a client's pricing and marketing strategies, and (ii) a discussion regarding opportunities for Plaintiffs to pitch their business or modify their pitch to the client based on such research.

d.  On August 15, 2017, Defendant Murphy forwarded an internal email from earlier that day containing (i) Plaintiffs' research regarding a client's challenges with regard to sales, and (ii) a discussion regarding how Plaintiffs should respond.

e.  On August 17, 2017, Defendant Murphy forwarded an internal email from the prior day containing (i) Plaintiffs' research regarding a client's marketing priorities, (ii) a discussion regarding how Plaintiffs should respond, and (iii) a list of over a dozen potential clients with whom Plaintiffs had recently been negotiating.

f.  Shortly thereafter, Defendant Murphy forwarded an internal email from that morning containing (i) Plaintiffs' research regarding developments in a subset of the beverage industry and (ii) the identity of a contact to provide leads for new business.

g.  Later that afternoon, Defendant Murphy forwarded an internal email chain dating back to July 2017 between Defendant Murphy and two points of contact at a

client containing (i) Plaintiffs' marketing strategy and talking points for pitching business, (ii) the names and contact information for decision-makers at the client, and (iii) a discussion regarding the client's use of influencer marketing.

55. It was not until early evening on August 24, 2017, that Defendant Murphy tendered her letter of resignation, effective immediately. And yet, that same day she continued forwarding emails to her personal account. Indeed, she forwarded one from earlier that month (containing detailed research regarding a client's media and marketing strategy and a discussion of the impact on Plaintiffs' business strategy) less than an hour before she tendered her resignation.

56. Upon her arrival at Ahalogy, Defendant Murphy immediately began using the information she had stolen from Plaintiffs for her benefit and the benefit of Ahalogy.

57. For example, minutes before she tendered her resignation on August 24, 2017, Defendant Murphy had reached out to inform a specific client of Plaintiffs that she was leaving Plaintiffs. Roughly a month later and after she had joined Ahalogy, she reached out to this same client directly to inform the client that she had moved to Ahalogy, requested a meeting to pitch Ahalogy's services, and included a paragraph-long description explaining "What Makes Ahalogy different"—the clear implication being that what made Ahalogy different is also what made Ahalogy better than Plaintiffs.

**The Terms of the Employment Agreement**

58. The Employment Agreement with Collective Bias that Defendant Murphy signed includes a "Confidentiality" provision pursuant to which Defendant Murphy acknowledged and agreed that in the course of her employment, she would have access to broad categories of "Confidential and Propriety Information" (as defined therein) and that she would treat such information as confidential, not use such information except in furtherance of the business of

Collective Bias, and not deliver copies of the information to anyone except to the extent authorized by Collective Bias or required in the ordinary course of her employment.

59. The Employment Agreement includes a "Client Information" provision pursuant to which Defendant Murphy acknowledged and agreed that in the course of her employment, she would have access to broad categories of confidential information of Collective Bias's clients, and that she would not disclose such information to anyone without Collective Bias's consent, and that upon termination of her employment, she would return to Collective Bias "all property of any client or prospective client of Employer" that was in her possession.

60. The Employment Agreement includes an "Employer Property" provision pursuant to which Defendant Murphy acknowledged and agreed that all property of Collective Bias (including customer lists and other items relating to the business of Collective Bias) coming into her possession during the course of her employment would remain the property of Collective Bias, and that upon termination of her employment, she would return it to Collective Bias "immediately."

61. The Employment Agreement also includes a "Restrictive Covenants" provision pursuant to which Defendant Murphy acknowledged and agreed to the following reasonable restrictions:

    a. NON-COMPETE. Employee agrees that during the term of employment and for a period of one (1) year following the termination of Employee's employment, with or without cause, with or without notice, by either party, Employee will not, directly or indirectly, render services to any social media or shopper marketing company or agency in the United States that is a direct competitor to any account to which Employee was principally assigned at any point during the twelve (12) month period preceding his/her separation with the Company.

    b. Employee agrees that during the term of employment and for a period of one (1) year, following the termination of Employee's employment, with or without cause, with or without notice, by either party, Employee will not, directly or indirectly solicit any customer or potential customer of Employer with whom Employee had contact or for whose account Employee worked

during the last twelve (12) months of Employee's employment with Employer.

c.  Employee agrees that for a period of one (1) year following the termination of Employee's employment, with or without cause, with or without notice, by either party, Employee will not, directly or indirectly attempt to encourage, induce, or otherwise solicit, directly or indirectly, any other employee of Employer to breach his or her employment agreement with Employer or to otherwise interfere with the advantageous business relationship of Employer with its employees.

d.  Employee further acknowledges that: (1) in the event his/her employment with the Employer terminates for any reason, he/she will be able to earn a livelihood without violating the foregoing restrictions and that (2) that his/her ability to earn a livelihood without violating such restrictions is a material coordination to his/her employment with Employer.

62. Defendant Murphy also agreed that any breach by her of the Employment Agreement could not reasonably or adequately be compensated in damages in an action at law, and that Collective Bias would be entitled to an injunctive relief to vindicate its rights under the Employment Agreement.

**The Terms of the CAPRAA**

63. The CAPRAA that Defendant Murphy also signed includes a "Disclosure and Usage Restrictions" provision pursuant to which Defendant Murphy acknowledged and agreed that she would not disclose or permit access to the "Confidential Information" (as defined therein) of Inmar and its subsidiaries (the "Company") except to other employees in the good faith performance of her employment duties or with the authorization of the Company, and that she "would not use the Company's Confidential Information for any purpose other than performing services for and on behalf the Company" within the proper scope of her job duties.

64. The CAPRAA includes a "Publications" provision pursuant to which Defendant Murphy acknowledged and agreed that she would not publish or submit for publication or otherwise share the Company's Confidential Information because such disclosure could cause harm to the

Company, including "by eliminating or diminishing the Company's or its Affiliates' competitive advantage."

65. The CAPRAA includes a "Confidential Treatment of Third Party Information" provision pursuant to which Defendant Murphy acknowledged and agreed that in the course of her employment, she would have access to broad categories of confidential information of third parties (such as the Company's clients), and that she would hold such information in the strictest confidence and not use that information unless such use is permitted by the Company or the third party.

66. The CAPRAA includes a "Tangible Materials" provision pursuant to which Defendant Murphy acknowledged and agreed that the Company retained sole ownership rights in all tangible materials provided to her by the Company and all tangible embodiments of and copies of "Proprietary Work Product" (as defined therein) and the Company's Confidential Information.

67. The CAPRAA includes a "General Duty of Loyalty Provision" pursuant to which Defendant Murphy acknowledged and agreed that during her period of employment, she owed the Company a general duty of loyalty, and further acknowledged and agreed that (among other things) she would not (i) usurp or divert for her own account or for any third party any business opportunity or potential business opportunity for the Company, (ii) interfere with the Company's existing business relationships, or (iii) compete against the Company's then-existing business or business plans.

68. The CAPRAA also includes a "Covenant Not To Compete" provision pursuant to which Defendant Murphy agreed to the following reasonable restrictions:

> You covenant and agree that during the "Non-Competition Period" and within the "Non-Competition Area," as defined below, you shall not engage in the "Business," as defined in Section 11 below in the same or substantially similar capacity in which you engaged in the Business on behalf of the Company. Specifically, but without

limiting the foregoing, you agree that during such period and within such area, you shall not do any of the following: (a) be an owner of any capital stock, other equity securities or ownership interests of any Business Entity (as defined herein) that conducts a business of a like or similar nature to the business; provided however that you may own up to five percent (5%) of the stock of a corporation traded on a national securities market in the United States of America or Canada; or (b) be an employee, officer, director, principal, agent, consultant, lender to, independent contractor or trustee of any Business Entity or other person that conducts a business of a like or similar nature to the business.

69. The CAPRAA defines "Business Entity" as "[a]ny corporation, sole proprietorship, general or limited partnership, limited liability company, joint venture, trust, unincorporated association or any other business entity."

70. The CAPRAA defines "Non-Competition Period" as follows:

[T]he period of your employment with the Company (the "Employment Term") and for a period of two (2) years after termination of the employment relationship between the parties for any reason (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants set forth herein.)

71. The CAPRAA defines "Non-Competition Area" as "the entire United States of America and Canada" based on Defendant Murphy's acknowledgement and agreement that:

[T]he Company does business on a nationwide basis in the United States of America and Canada, and that a breach of your covenants contained herein would immeasurable and irreparably damage the Company, regardless of the area in which the competing business is located in which the activities constituting such breach were to occur.

72. The CAPRAA defines "Business" as "any business or service engaged in, as well as any new products or service offerings for which there is substantial development or market launch plans, by the Company or any of its Affiliates for which you have provided services during the term of your employment."

73. The CAPRAA also includes a "Non-Solicitation Covenant" provision pursuant to which Defendant Murphy agreed to that during the Non-Competition Period, she would not:

(a) [F]or yourself, or on behalf of any other person or Business Entity solicit, divert or take away, or attempt to solicit, divert, or take away any of the customers, or prospective customers of the Company with whom you had contact during the twelve (12) months prior to the termination of your employment relationship with the Company; or (b) induce (or assist any other person to induce) any person to leave the employ of the Company.

74. Defendant Murphy agreed that the foregoing restrictions are reasonable.

## COUNT I
### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*
### (Against Murphy and Ahalogy)

75.  Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

76. The Defend Trade Secrets Act prohibits the misappropriation of trade secrets.

77. Plaintiffs have developed and own valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce.

78. Those trade secrets are financial, business, scientific, technical, economic, and engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and codes, both tangible and intangible and stored, compiled, and memorialized physically, electronically, graphically, and photographically, and include:

a. Customer information, including the identity of current, former, and prospective customers and the identity of and contact information for the decision-makers at the customers;

b. Influencer information, including the identity of current, former, and prospective influencers, and the contact information for the influencers;

c. Business intelligence and research regarding current, former, and prospective customers, including their marketing and sales strategies; and,

    d.   Information regarding Collective Bias's product offerings (including the design and functionalities of its Shopper Social Media™ platform, Prescriptive IQ™ platform, and Social Fabric® community), positioning in the market, pricing, competitive differentiators, territory and account plans, lead sources, rate cards, budget templates, timeline standards, business opportunities, and research dossiers.

79. This information has value because it is not generally known and is not readily ascertainable. Plaintiffs have spent a significant amount of time and devoted substantial resources to developing this information, and through it Plaintiffs are able to operate and grow their business in a way that is difficult for their competitors to duplicate.

80. Because this information has value by virtue of its secrecy, and Plaintiffs have taken reasonable measures to keep it secret. Those measures include implementing policies intended to support Plaintiffs' efforts to maintain the secrecy of their trade secrets; limiting access to hardware, software, and physical locations using passwords, keys, key cards, and security personnel; terminating access to confidential information at the conclusion of employment and requiring its return; and procuring nondisclosure, non-solicitation, and noncompetition agreements.

81. Defendants have obtained economic benefit from the theft of these trade secrets, including winning new customers based on the unauthorized disclosure and use of the information.

82. Defendants used improper means to acquire these trade secrets knowing (and having reason to know) that the acquisition was improper. Indeed, despite being obligated to maintain the confidentiality of the information, and after accepting the offer of employment with Ahalogy

but before ending her employment relationship with Plaintiffs, Defendant Murphy accessed

Plaintiffs' systems without authorization and/or exceeding her authorization, collected this

information, and emailed it to her personal email account in order to benefit herself and Ahalogy.

83. As a result of Defendants' unlawful actions, Plaintiffs have suffered harm, including the

loss of business and the diminution in value of their confidential information, damaging

Plaintiffs in an amount to be determined at trial.

**COUNT II**
**Violation of the Illinois Trade Secrets Act, 765 ILCS 1065** *et seq.*
**(Against Murphy and Ahalogy)**

84. Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as

though set forth fully herein.

85. The Illinois Trade Secrets Act also prohibits the misappropriation of trade secrets.

86. As a result of Defendants' unlawful actions, Plaintiffs have suffered harm, including the

loss of business and the diminution in value of their confidential information, damaging

Plaintiffs in an amount to be determined at trial.

**COUNT III**
**Breach of Contract (Michigan Law)**
**(Against Murphy)**

87. Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as

though set forth fully herein.

88. A breach of contract occurs under Michigan law (the law by which the parties agreed the

Employment Agreement would be governed) where there was a contract which the other party

breached thereby resulting in damages to the party claiming a breach.

89. On or about November 19, 2015, Defendant Murphy and Collective Bias (both of whom

were competent to enter into a binding agreement) entered into a valid, enforceable contract

when they each signed the Employment Agreement signifying their intent to be bound by the Employment Agreement.

90. The Employment Agreement was supported by valid consideration. Among other things, and pursuant to the terms of the Employment Agreement (summarized herein), Collective Bias agreed to employ Defendant Murphy in exchange for Defendant Murphy's agreement to:

    a. Maintain the confidentiality of Collective Bias's Confidential or Proprietary Information and its client's confidential information;

    b. At the conclusion of her employment, return to Collective Bias all of Collective Bias's property and all Confidential or Proprietary Information;

    c. At the conclusion of her employment, and for a period of one year thereafter, not directly or indirectly compete with Collective Bias per the terms of the Employment Agreement; and,

    d. At the conclusion of her employment, not directly or indirectly solicit any customer or potential customer of Collective Bias per the terms of the Employment Agreement.

91. Defendant Murphy expressly agreed that these restrictions were reasonable and would not preclude her from earning a livelihood.

92. Defendant Murphy also agreed that any breach could not reasonably or adequately be compensated in damages in an action at law, and that Collective Bias would be entitled to injunctive relief for any breach.

93. These terms of the Employment Agreement survived the termination of Defendant Murphy's employment.

94. Notwithstanding the foregoing agreement, and in breach thereof, Defendant Murphy, immediately following the end of her employment relationship with Plaintiffs and before the expiration of one year, began working for Ahalogy—a social media and marketing company that is a direct competitor of Collective Bias—and soliciting the business of customers and potential customers of Collective Bias with whom she had contact or for whose account she worked during the twelve months immediately preceding the termination of the employment relationship.

95. In further breach of the Employment Agreement, Defendant Murphy also personally collected, and failed to return to Collective Bias upon the termination of the employment relationship, Collective Bias's property and Confidential or Proprietary Information and its clients' confidential information; delivered and disclosed to Ahalogy the property and information; and employed it for her benefit and the benefit of Defendant Ahalogy rather than for the sole furtherance of the business of Collective Bias.

96. As a direct result of these breaches of the Employment Agreement, Plaintiffs have suffered harm, including the loss of business and the diminution in value of the Confidential or Proprietary Information, damaging Plaintiffs in an amount to be determined at trial.

**COUNT IV**
**Breach of Contract (North Carolina Law)**
**(Against Murphy)**

97. Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

98. A breach of contract occurs under North Carolina law (the law by which the parties agreed the CAPRAA would be governed) where there is a valid contract and that contract is breached.

99. On or about December 27, 2016, Defendant Murphy and Inmar (both of whom were competent to enter into a binding agreement) entered into a valid, enforceable contract when on December 23, 2016 and December 27, 2016 they each respectively signed the CAPRAA signifying their intent to be bound by the CAPRAA.

100. The CAPRAA was supported by valid consideration. Among other things, and pursuant to the terms of the CAPRAA (summarized herein) Inmar agreed to employ Murphy and make available to her all the additional benefits of being employed by Inmar in exchange for Defendant Murphy's agreement to:

    a.  Maintain the confidentiality of Plaintiffs' Confidential Information and third parties' confidential information;

    b.  At the conclusion of her employment, return to Plaintiffs all of their property and all Confidential Information;

    c.  Abide by her duty of loyalty to Plaintiffs;

    d.  Abide by the terms of the non-compete;

    e.  Abide by the terms of the non-solicitation.

101. Defendant Murphy expressly agreed that these restrictions were reasonable.

102. Defendant Murphy also agreed that any breach of the CAPRAA could not reasonably or adequately be compensated in damages in an action at law, and that Inmar would be entitled to injunctive relief for any breach.

103. These terms of the CAPRAA survived the termination of Defendant Murphy's employment.

104. Notwithstanding the foregoing agreement, and in breach thereof, Defendant Murphy, immediately following the end of her employment relationship with Plaintiffs and before the

expiration of two years, began (i) working in Chicago for Ahalogy and (on information and belief) receiving stock in Ahalogy—a company that conducts a business of a like or similar nature to the business services engaged in by Plaintiffs—in the same or substantially similar capacity in which she worked for Plaintiffs, and (ii) soliciting the business of customers and prospective customers of Plaintiffs with whom she had contact during the twelve months immediately preceding the termination of the employment relationship.

105. In further breach of the CAPRAA, Defendant Murphy also personally collected and failed to return to Plaintiffs upon the termination of the employment relationship Plaintiffs' property and Confidential Information and confidential information of third parties; delivered and disclosed to Ahalogy that property and information; and employed it for her benefit and the benefit of Defendant Ahalogy rather than for the sole furtherance of the business of Plaintiffs.

106. Defendant Murphy also violated her duty of loyalty by engaging in the conduct described above.

107. As a direct result of these breaches of the CAPRAA, Plaintiffs suffered harm, including the loss of business and the diminution in value of the Confidential Information, damaging Plaintiffs in an amount to be determined at trial.

**COUNT V**
**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.***
**(Against Murphy and Ahalogy)**

108. Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

109. The Computer Fraud and Abuse Act prohibits unauthorized access of protected computers.

110. As described above, Plaintiffs provided Defendant Murphy with a computer, an email account, and access to Plaintiffs' facilities and other computers for use in the performance of her employment. That computer, email account, and access provided access to worldwide communications through applications accessible via the internet.

111. Defendant Murphy used that computer, email account, and access to work and communicate with clients and prospective clients located across the country, as well as work and communicate with Plaintiffs' other employees also located across the country (including in Illinois, in Arkansas, and in North Carolina) and to access Plaintiffs' interstate computer network and servers on which files were stored.

112. As detailed above, Defendant Murphy agreed in the Employment Agreement and CAPRAA to return Plaintiffs' property at the conclusion of her employment, maintain the confidentiality of the Confidential or Proprietary Information and Confidential Information, and not access or use the information except in the course of her employment for the benefit of Plaintiffs. Defendant Murphy also owed Plaintiffs a duty of loyalty. Defendant Murphy's use of her computer and email account and access to facilities and other computers was limited by these obligations.

113. Defendant Murphy, however intentionally used her computer, email account, and Plaintiffs' facilities and other computers for a different purpose (which she accomplished): to obtain Plaintiffs' Confidential or Proprietary Information and Confidential Information for her own enrichment and that of Defendant Ahalogy. That access therefore was intentional, without authorization, and/or exceeded her authorized access.

114. These actions caused damage and loss. The loss includes the cost of responding to the Defendants' unlawful actions and conducting damage assessment, which is ongoing and will exceed $5,000 well before the expiration of a one year period.

115. Defendant Ahalogy conspired with Defendant Murphy in the commission of these unlawful acts.

116. Defendants therefore violated 18 USC §§ 1030(a)(2)(C), (a)(5)(C), and (b), damaging Plaintiffs in an amount to be determined at trial.

**COUNT VI**
**Tortious Interference with Contract**
**(Against Ahalogy)**

117. Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

118. As detailed above, valid contracts existed between Plaintiffs and Defendant Murphy.

119. Defendant Ahalogy was aware of these contracts, but nevertheless hired Defendant Murphy with the knowledge and intent that Defendant Murphy would breach those contracts as its new Director of Sales.

120. As detailed above, Defendant Murphy did breach those contracts, damaging Plaintiffs in an amount to be determined at trial.

**COUNT VII**
**Conversion**
**(Against Murphy and Ahalogy)**

121. Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

122. As detailed above, Defendant Murphy agreed in the Employment Agreement and CAPRAA to return Collective Bias's property at the conclusion of her employment, maintain the

confidentiality of the Confidential or Proprietary Information and Confidential Information, and not access or use the information except in the course of her employment for the benefit of Plaintiffs.

123. As also detailed above, Defendant Murphy, without authorization and/or exceeding her authorization, obtained and failed to return Plaintiffs' property and Confidential or Proprietary Information and Confidential Information for her own enrichment and that of Defendant Ahalogy.

124. Plaintiffs had a right to the property and Confidential or Proprietary Information and Confidential Information, and an unconditional right to the immediate possession of it.

125. By obtaining, using, and disclosing the property and information, the value of it has already diminished such that its return would not alleviate Plaintiffs' loss, damaging Plaintiffs in an amount to be determined at trial.

## COUNT VIII
### Trespass to Chattels
### (Against Murphy and Ahalogy)

126. Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

127. By obtaining and failing to return Plaintiffs' property and Confidential or Proprietary Information and Confidential Information and instead using it for their own enrichment, Defendants dispossessed Plaintiffs of the property and Confidential or Proprietary Information and Confidential Information (because once used and disclosed, it no longer had the value it did before Defendants' unlawful actions), damaging Plaintiffs in an amount to be determined at trial.

## COUNT IX
### Unjust Enrichment
### (Against Murphy and Ahalogy)

128. Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

129. By virtue of having collected and used Plaintiffs' property and Confidential or Proprietary Information and Confidential Information, Defendants unjustly retained a benefit to the detriment of Plaintiffs, and that retention violates fundamental principles of justice and equity.

130. In so doing, Defendants dispossessed Plaintiffs of the property and Confidential or Proprietary Information and Confidential Information (because once used and disclosed, it no longer had the value it did before her unlawful actions), damaging Plaintiffs in an amount to be determined at trial.

## COUNT X
### Civil Conspiracy
### (Against Murphy and Ahalogy)

131. Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

132. When, as detailed above, Defendants met and had discussions regarding hiring Defendant Murphy for the role of Director of Sales, they formed an agreement to undertake all of the foregoing unlawful conduct.

133. The foregoing unlawful conduct (such as Defendant Murphy accessing Plaintiffs' systems to obtain Plaintiffs' property and Confidential or Proprietary Information and Confidential Information for Defendants' use) was taken in furtherance of that agreement.

134. Plaintiffs have been damaged as a result in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue the following relief:

1. Enter judgment in Plaintiff's favor on Counts I through X of this Complaint;

2. Issue an injunction to prevent misappropriation of and protect Plaintiffs' trade secrets on such terms as the court deems reasonable;

3. Issue an injunction requiring Defendant Murphy to honor her obligations under the Employment Agreement and CAPRAA;

4. Issue an injunction requiring Defendants Murphy and Ahalogy to cease use of and return to Collective Bias and Inmar all property and information unlawfully obtained by and through Defendant Murphy;

5. Award Plaintiffs monetary damages and interest (including exemplary and punitive damages, as appropriate);

6. Award Plaintiffs their reasonable attorneys' fees and costs of litigation; and,

7. Award Plaintiffs any further relief the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: March 29, 2018

Respectfully Submitted,

/s/ Justin O. Kay

Andrew C. Porter (ARDC No. 6209750)
andrew.porter@dbr.com
Justin O. Kay (ARDC No. 6286557)
justin.kay@dbr.com
Matthew M. Morrissey (ARDC No. 6302575)
matthew.morrissey@dbr.com
**DRINKER BIDDLE & REATH LLP**
191 North Wacker Drive, Suite 3700
Chicago, IL 60606-1698
Tel:     (312) 569-1000
Fax:     (312) 569-3000

*Counsel for Plaintiffs Inmar, Inc. and*
*Collective Bias, Inc.*