## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| INMAR, INC. and COLLECTIVE BIAS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 18-cv-2306 |
| v. | ) | |
| | ) | Hon. Charles R. Norgle |
| MONICA MURPHY VARGAS and MLW | ) | |
| SQUARED, INC., d/b/a/ AHALOGY, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

Inmar, Inc. ("Inmar") and Collective Bias, Inc. ("Collective Bias") (together "Plaintiffs") bring

this action against Monica Murphy ("Murphy") and MLW Squared, Inc. d/b/a Ahalogy ("Ahalogy")

(collectively "Defendants") for matters arising from Murphy's employment with Ahalogy. The

Complaint alleges misappropriation of trade secrets under the Defend Trade Secrets Act (the "DTSA"),

18 U.S.C. § 1836 *et seq.* (Count I), misappropriation of trade secrets under the Illinois Trade Secrets

Act (the "ITSA"), 765 ILCS 1065 *et seq.* (Count II), violation of the Computer Fraud and Abuse Act

("CFAA"), 18 U.S.C § 1030 *et seq.* (Count V), conversion (Count VII), trespass to chattels (Count

VIII), unjust enrichment (Count IX), and civil conspiracy (Count X) against both Murphy and Ahalogy;

breach of contract (Count III), and breach of contract (Count IV) against Murphy; and tortious

interference with contract (Count VI) against Ahalogy. Defendants now move under Federal Rule of

Civil Procedure 12(b)(6) to dismiss the Complaint. For the reasons provided, the motion is granted in

part and denied in part.

### I.    BACKGROUND

Collective Bias is an influencer marketing company. Influencer marketing is a form of

marketing where a seller leverages the popularity and credibility of particular individuals to market

specific products in a testimonial manner. This model uses a broad array of individuals who wield

measurable influence on various platforms, *e.g.*, Facebook, Twitter, Instagram, YouTube, various blogs, and other social media platforms. Modern influencer marketing seeks to use persons that are relatable to the market audience and have those individuals explain how and why they incorporate a particular product in their everyday life.

Plaintiffs assert that this marketing is more targeted than traditional methods of celebrity endorsements and the resulting impact is uniquely quantifiable. To be effective, Plaintiffs are required to understand the seller's business, product, or service, identify influencers who can be used as credible marketers of the said product, and develop relationships with the influencers and use them to market the product. Collective Bias states it has spent millions of dollars developing its knowledge of products and influencers, as well as contacts at major brands in order to most effectively sells its influencer marketing services. Collective Bias has also developed Social Fabric®, Shopper Social Media™, and Prescriptive IQ™. These services were built with proprietary research to connect influencer content with key audiences using advanced analytics and behavior tracking.

On or about November 19, 2015, Murphy was hired by Collective Bias to serve as its Senior Director of Business Development. Murphy's duties included: knowing Collective Bias's product offerings, pricing, and positioning; managing territory/account plans; and prospecting potential clients. Upon being hired, Murphy signed an employment agreement—the Collective Bias Agreement ("CBA"). The CBA included a confidentiality covenant (Compl., Ex. A §§ 1) ("CBA Confidentiality Covenant"), a non-compete covenant (Id. at § 5(a)) ("CBA Non-Compete Covenant"), a non-solicitation covenant (Id. at 5(b)) ("CBA Non-Solicitation Covenant"), and an employer property covenant (Id. at § 4)) ("CBA Employer Property Covenant"). Murphy was issued a keycard to access Collective Bias's secure facilities, a laptop computer, and access to Collective Bias's interstate computer network. In her role, Murphy had access to Collective Bias's confidential and proprietary information including: Collective Bias's product offering; position in the market; pricing; competitive

2

differentiators; territory and account plans; lead sources; client business objectives; rate cards; budget templates; client lists; and research dossiers.

In or around December 2016, Inmar acquired Collective Bias. Despite the acquisition, Collective Bias retained its name and continued to operate as its own entity. However, its employees were required to sign another agreement with Inmar—the Confidential and Proprietary Rights Assignment Agreement (the "CAPRAA"). The CAPRAA contained similar covenants to the CBA, i.e., confidentiality covenants (Compl., Ex. B §§ 1-2.2) ("CAPRAA Confidentiality Covenant"), a "Covenant Not To Compete" (Id. at § 7) ("CAPRAA Non-Compete Covenant"), and a "Non-Solicitation Covenant" (Id. at § 8) ("CAPRAA Non-Solicitation Covenant"). Plaintiffs allege that Murphy agreed to sign the CAPRAA in exchange for employment with Inmar and additional benefits associated therewith.

Defendant Ahalogy is also an influencer marketing company and engages in the same form of marketing as Collective Bias. Ahalogy offers products and services that compete with Plaintiffs' products and services. Plaintiffs' aver that Murphy was aware that Ahalogy was a direct competitor of Plaintiffs. Nevertheless, on or about July 12, 2017, Murphy purportedly authorized a recruiter to contact her regarding potential employment at Ahalogy. Plaintiffs allege that the job description and qualifications for the position at Ahalogy, which Murphy was pursuing, were nearly identical to her position with Collective Bias. Compare Compl., Ex. C, with Ex. D. Soon after speaking with the recruiter, Ahalogy offered Murphy the role of Director of Sales and she accepted.

After accepting the offer from Ahalogy, but prior to notifying Plaintiffs of her intent to leave, Murphy allegedly used her credentials to access Plaintiffs' computer systems and collected Plaintiffs' confidential and proprietary information. Plaintiffs allege that Murphy accessed Plaintiffs' computer systems using her work-issued computer and forwarded information to her personal email account including: Collective Bias's product offering; position in the market; pricing; competitive differentiators; territory and account plans; lead sources; client business objectives; rate cards; budget

3

templates; client lists; and research dossiers. Plaintiffs claim that Murphy began forwarding their confidential information from August 4, 2017, up until the afternoon on August 24, 2017—hours before she resigned. Additionally, shortly before submitting her resignation, Murphy purportedly reached out to one of Plaintiffs' clients to inform the client that she was leaving. On August 24, 2017, Murphy tendered Plaintiffs her resignation, effective immediately. Approximately one month after joining Ahalogy, Murphy allegedly contacted the same client and requested a meeting to pitch Ahalogy's services. Plaintiffs aver that Murphy and Ahalogy began using Plaintiffs' proprietary information to benefit themselves.

Defendants now move to dismiss the entire complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## II.     ANALYSIS

### A.  Standard of Review

A motion under Rule 12(b)(6) tests the sufficiency of the complaint under the plausibility standard, Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 570 (2007), not the merits of the suit. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted). "[A] plaintiff's claim need not be probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 935 (7th Cir. 2012) (quoting Twombly, 550 U.S. at 556). "To meet this plausibility standard, the complaint must supply 'enough fact to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." Id. at 935. (quoting Twombly, 550 U.S. at 556). In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in a plaintiff's complaint and draws all reasonable inferences in his favor. Burke, 714 F.3d at 504 (citations omitted). "[T]he complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." EEOC v. Concentra Health Servs., 496 F.3d 773, 776 (7th Cir. 2007).

4

**B. Misappropriation of Trade Secrets in Violation of the DTSA and the ITSA (Counts I and II)**

Counts I and II of Plaintiffs' complaint sets forth claims for violations of the ITSA and the DTSA against Murphy and Ahalogy. "To prevail on a claim for misappropriation of a trade secret under [the ITSA], the plaintiff must demonstrate that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business." Learning Curve Toys, Inc. v. PlayWood Toys, Inc., 342 F.3d 714, 721 (7th Cir. 2003). "Similarly, the DTSA creates a private cause of action in favor of the owner of a trade secret that is misappropriated 'if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" Mickey's Linen v. Fischer, No. 17 C 2154, 2017 WL 3970593, at *8 (N.D. Ill. Sept. 8, 2017) (quoting 18 U.S.C. § 1836(b)(1)).

"To establish a protectable trade secret under either statute, the party seeking protection must show that the information: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc., No. 16 CV 11390, 2017 WL 7795125, at *13 (N.D. Ill. Dec. 9, 2017) (citing 765 ILCS 1065/2(d) and 18 U.S.C. § 1839(3)). "The following additional common law factors are significant in determining whether a trade secret exists: (1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his or her competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Delta Med. Sys. v. Mid-America Med. Sys., 772 N.E.2d 768, 780 (Ill. App. 2002).

5

"The existence of a trade secret ordinarily is a question of fact." Learning Curve Toys, Inc. v. PlayWood Toys, Inc., 342 F.3d 714, 722 (7th Cir. 2003). The Seventh Circuit has noted that a trade secret is one of the most elusive and difficult concepts in the law to define. Id. at 727 (quoting Lear Siegler, inc. v. Ark-Ell Springs. Inc., 569 F.2d 286, 288 (5th Cir. 1978)). "Whether a plaintiff adequately alleges the existence of a trade secret is a fact intensive analysis, but courts have found allegations to be adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms." Covenant Aviation Sec., LLC v. Berry, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014). "[C]ourts only dismiss a claim for lack of specificity on the pleadings in the most extreme cases." Mission Measurement Corp. v. Blackbaud, Inc., 216 F. Supp. 3d 915, 921 (N.D. Ill. 2016) (citation omitted). Thus, "the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side." Id. (citation omitted).

Plaintiffs have sufficiently alleged that the confidential information Murphy forwarded to her private computer contained Plaintiffs' trade secrets. Plaintiffs allege that Murphy possessed, *inter alia*, the following confidential and proprietary information: business development plans for existing clients, Plaintiffs' pricing and marketing strategies, lead sources, client lists, position in the market, and research dossiers. Collective Bias claims that it spent years and millions of dollars developing its knowledge of products and influencers, developing client dossiers, and marketing strategies. Additionally, Plaintiffs claim that the information is not readily ascertained or generally known. Other courts in this district have found similar alleged confidential information to be sufficient to base trade secret claims upon. See Labor Ready, Inc. v. Williams Staffing. L.L.C., 149 F. Supp. 2d 398, 412 (N.D. Ill. 2001) (finding that marketing strategies, pricing data, and confidential business practices satisfied the notice pleading requirements); See also Covenant Aviation, 15 F.Supp.3d at 819 (finding that plaintiff's information which included profit and loss information, internal costs and overhead, operational information, and specific bid and proposal information were sufficiently confidential to be

the basis of a trade secret); Labor Ready, Inc. v. Williams Staffing, LLC, 149 F. Supp. 2d 398, 412 (N.D. Ill. 2001).

Plaintiffs' also must allege that they took reasonable steps to safeguard their confidential information. 765 ILCS 1065/2(d); 18 U.S.C. § 1839(3). Here, Plaintiffs allege more than rote repetition of statutory language. Plaintiffs claim that they have made efforts to keep the information secret by using passwords, key cards, security personnel, terminating access to confidential information when employment ends, and requiring employees to sign nondisclosure and noncompetition agreements. Such allegations are sufficient at the pleading stage to demonstrate that Plaintiffs took reasonable steps to safeguard their information. See Dick Corp. v. SNC-Lavalin Constructors, Inc., No. 04 C 1043, 2004 WL 2967556, at *10 (N.D. Ill. Nov. 24, 2004) ("[W]hether the measures taken by a trade secret owner satisfy the [ITSA] reasonableness standard ordinarily is a question of fact for the jury and not one to be decided at the pleading stage.").

Having determined that Plaintiffs sufficiently allege trade secrets under the ITSA and the DTSA, the Court turns to whether they have alleged Murphy misappropriated those trade secrets. "Misappropriation can be shown one of three ways—by improper acquisition, unauthorized disclosure, or unauthorized use." Covenant Aviation, 15 F. Supp. 3d at 819. Plaintiffs allege that for several week prior to resigning, Plaintiffs forwarded multiple emails from her Collective Bias issued computer to her private email. These emails possessed Plaintiffs' confidential information. e.g., customer lists, business development plans, pricing, and market strategies. Murphy's alleged conduct exceeded her authorized use of Plaintiffs' confidential information. Plaintiffs claim that shortly after Murphy started working for Inmar, she began to use Plaintiffs' confidential information to benefit herself and Inmar. More specifically, Murphy used the information to solicit Plaintiffs' clients. These allegations are sufficient plead misappropriation. See RKI, Inc. v. Grimes, 177 F. Supp. 2d 859, 875 (N.D. Ill. 2001) (finding misappropriation, where the former employee downloaded or copied the plaintiff's confidential data shortly before resigning and later used the data to help solicited business from the

plaintiff's); <u>Liebert Corp. v. Mazur</u>, 827 N.E.2d 909, 926 (Ill. App. 2005) (finding misappropriation where the employee downloaded several price books on his laptop computer just hours before resigning and agreeing to work for competitor).

Thus, viewing the well-pleaded facts and all reasonable inferences in Plaintiffs' favor, they have sufficiently alleged Murphy and Inmar violated the ITSA and the DTSA.

## C. CBA—Preemption and Breach of Contract (Count III)

### 1. No preemption by CAPRAA

Plaintiffs allege that Murphy breached various covenants of the CBA. However, Defendants argue that the CBA is unenforceable because it was superseded by the CAPRAA and that Plaintiffs fail to allege a breach or resulting damages. The CBA contains a Michigan choice of law provision, Compl., Ex A § 16, and the CAPRAA contains a North Carolina choice of law provision, Compl., Ex B § 18,—neither party objects to the application of either of these provisions.[1]

First, Defendants argue that that the CBA is unenforceable because it was superseded by the CAPRAA. Defendants point to the CAPRAA's "Entire Agreement" covenant, which states that it "is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between us." Compl., Ex. B § 21.4. From this clause, Defendants argue that the CBA is superseded and thus, no longer enforceable. The Court disagrees. It is not clear from the plain language of the CAPRAA whether the parties intended for it to supersede the CBA.

"The merger clauses were designed to effectuate the policies of the Parol Evidence Rule; *i.e.*, barring the admission of prior and contemporaneous negotiations on terms inconsistent with the terms of the writing." <u>Zinn v. Walker</u>, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987)

---

[1] Defendants object to the applicability of Michigan and North Carolina laws, but only to the extent they conflict with Illinois policy requirements.

"North Carolina clearly recognizes the validity of merger clauses and the state courts have repeatedly enforced such clauses." Smith v. Cent. Soya of Athens, Inc., 604 F. Supp. 518, 526 (E.D.N.C. 1985) (collecting cases). Merger clauses "create a rebuttable presumption that the writing represents the final agreement between the parties." White v. Burton Farm Dev. Co. LLC, 750 S.E.2d 920 (N.C. App. 2013). However, there is an exception to this general rule which applies "when giving effect to the merger clause would frustrate the parties' true intentions." Hinshaw v. Wright, 412 S.E.2d 138, 141 (N.C. 1992). The Court can determine the intention of the parties from the words of the contract, provided such language is clear. Walton v. City of Raleigh, 467 S.E.2d 410, 411 (N.C. 1996).

Here, the plain language of the CAPRAA is not clear as to the intent of the parties. The CAPRAA's Entire Agreement Covenant, which Defendants point to in support of their argument, states it "supersedes and merges all prior *discussions* between us." Compl., Ex. B § 21.4 (emphasis added). Defendants argue that it "defies logic" to interpret "discussions" to not include prior written agreements. Def.'s Reply [38], at 2. Defendants do not support this proclamation with citations to any case law. Contrary to Defendants' unsupported argument, the Court does not, as a matter of law, construe "discussion" to encompass prior written agreements. "Discussion" is "[t]he act of exchanging views on something; a debate." *Discussion*, Black's Law Dictionary (10th ed. 2014). It is not clear from the word "discussion" whether the parties intended the CAPRAA to supersede the CBA—a written agreement. Plaintiffs allege that the terms of the CBA were not superseded and its terms survived the termination of Murphy's employment. These allegations in addition to the ambiguity of the word "discussions" provide a sufficient basis to reject Defendants' argument. See UAW-GM Human Res. Ctr. v. KSL Recreation Corp., 579 N.W.2d 411, 414 (Mich. App. 1998) ("A contract is ambiguous if its words may reasonably be understood in different ways."); Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 544 (6th Cir. 2007) (stating that when contract language is ambiguous its meaning becomes a question of fact and testimony may be taken to explain the ambiguity).

9

## 2. Breach of the CBA

Having determined that, for the purposes of this motion, the CAPRAA did not supersede the CBA, the Court turns to Defendants' next argument; that Plaintiffs fail to allege breach of the CBA or resulting damages. "A plaintiff seeking to recover for breach of contract must prove that a contract existed between the parties, the defendant breached the contract, and the breach damaged the plaintiff." Appalachian Railcar Servs. v. Boatright Enters., 602 F. Supp. 2d 829, 867 (W.D. Mich. 2008). Here, Plaintiffs allege that Murphy breached four clauses of the CBA: (1) the CBA Confidentiality Covenant, which restricts Murphy's disclosure of confidential information; (2) the CBA Employer Property Covenant, which requires Murphy to return to Plaintiffs all property of Plaintiffs upon resignation; (3) the CBA Non-Solicitation Covenant, which prevents Murphy from soliciting one of Plaintiffs' clients for whom she was principally assigned or had contact with in the twelve months proceeding Murphy's resignation; and (4) the CBA Non-Compete Covenant, restrictions upon rendering services for direct competitor of Plaintiffs.

Defendants argue that the restrictive covenants, *i.e.*, the CBA Non-Solicitation Covenant and CBA Non-Compete Covenant, are facially unreasonable, and thus unenforceable. The Michigan Antitrust Reform Act authorizes agreements not to compete as long as they are reasonable, it reads:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of the employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

Mich. Comp. Laws § 445.774a(1). Michigan appellate courts have determined that "§ 4a(1) represents a codification of the common-law rule that the enforceability of noncompetition agreements depends on their reasonableness." St. Clair Med., P.C. v. Borgiel, 715 N.W.2d 914, 918 (Mich. App. 2006). "Reasonableness is decided by examining several factors [including] the consideration supporting the

agreement, the economic hardship imposed on the employee, the public interest, and whether the employer has a legitimate business interest for the protection of which a restriction is reasonable." RAM Prods. Co. v. Chauncey, 967 F. Supp. 1071, 1091 (N.D. Ind. 1997). Accordingly, the "reasonableness inquiry is inherently fact specific." Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 547 (6th Cir. 2007). Not one of the three cases cited above determined the issue of reasonableness of a non-compete at the motion to dismiss stage. The Court finds that this fact intensive inquiry in this matter is ill-suited for Defendants' present motion.

Moreover, even if the Court determined that the CBA's restrictive covenants were facially unreasonable, Plaintiffs could still proceed on their breach of contract claim. Defendants argue that the CBA Non-Compete Covenant is unenforceable because it prohibits Murphy from working in any capacity or scope for any competitor of Plaintiffs', citing Mapal, Inc. v. Atarsia, 147 F. Supp. 3d 670, 679 (E.D. Mich. 2015) (stating that a limitation on working in any capacity for a competitor of a former employer is too broad to be enforceable).

The CBA's Non-Compete Covenant reads:

> Employee agrees that during the term of employment and for a period of one (1) year, following the termination of Employee's employment, with or without cause, with or without notice, by either party. Employee will not, directly or indirectly, render services to any social media or shopper marketing company or agency in the United States that is a direct competitor to any account to which Employee was principally assigned at any point during the twelve (12) month period preceding his/her separation with the Company.

Compl., Ex. A § 5(a). Even if this language was determined to be unreasonable, the Michigan statute allows courts to blue pencil or limit the restrictive agreement to make it reasonable. Mich. Comp. Laws § 445.774a(1) (providing that "a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited."); see also Bristol Window & Door v. Hoogenstyn, 650 N.W.2d 670, 674 (Mich. App. 2002); Calder Dev. Assocs. v. Knuth, 2004 WL 2102028, at *3 (Mich. Ct. App. Sept. 21, 2004). Here, even if the non-compete covenant could be further limited, Plaintiffs' allegations would be sufficient to *allege* that Murphy

11

breached it. Plaintiffs do not claim that Murphy was hired to be a custodian for Ahalogy. Rather Murphy was hired to perform effectively the same job she performed for Plaintiffs. Nevertheless, such analysis is more academic at this time, since, for the purposes of this motion, the Court is not ruling on the reasonableness of the CBA Non-Compete Covenant.

Alternatively, Defendants' argue that even if the CBA is enforceable, Plaintiffs fail to allege Murphy breached its covenants. The Court disagrees. Plaintiffs have sufficiently alleged violations of the four challenged covenants. As discussed above, Plaintiffs' claim that Murphy took Plaintiffs' confidential and proprietary information and disclosed it to Ahalogy—a direct competitor of Collective Bias. Murphy divulged this confidential information within a few months of her resignation from Collective Bias. Upon her resignation, Murphy was required under the CBA to return all of Plaintiffs' property, including: computer files; documents; customer lists; plans; and promotional materials. Compl., Ex. A § 4. In contravention of the CBA's requirements, Murphy allegedly did not return Plaintiffs' property at the time of her resignation. Rather, she purportedly forwarded Plaintiffs' confidential information to her personal email. Also, within a month of beginning her employment with Ahalogy, Murphy allegedly contacted at least one of Plaintiffs' clients—a client Murphy worked with while she was employed by Plaintiffs—and requested an opportunity to pitch Ahalogy's services. Finally, Plaintiffs claim that Defendants used the misappropriated trade secrets to gain a competitive advantage. These allegations are sufficient to put Defendants' on notice of which CBA covenants Murphy purportedly breach, and the relevant conduct that is the basis for each respective breach.

For the reasons stated, the Court refrains from determining the reasonableness of the CBA's restrictive covenants and determines that Plaintiffs' sufficiently allege breach of contract. Accordingly, Defendants' motion to dismiss Plaintiffs' Count III is denied.

### D. CAPRAA—Enforceability and Breach of Contract (Count IV)

After Inmar's acquisition of Collective Bias's employees were required to sign the CAPRAA. Plaintiffs allege that Murphy's conduct breached various covenants in the CAPRAA. The parties do

not dispute that the CAPRAA is governed by North Carolina law, as instructed in its "Governing Law" covenant. Compl., Ex. B § 18. Initially, the Defendants challenge the enforceability of the restrictive covenants contained in the CAPRAA, *i.e.*, the CAPRAA Non-Compete Covenant and CAPRAA Non-Solicitation Covenant. Id. at §§ 7, 8.

Under North Carolina law, both the CAPRAA's Non-Solicitation Covenant and the CAPRAA Non-Compete Covenant are considered restrictive covenants because both clauses seek to prevent Murphy from engaging in a similar business in competition with Plaintiffs. See Chemimetals Processing v. McEneny, 476 S.E.2d 374, 376 (N.C. App. 1996) (stating that an agreement is a restraint of trade if it seeks to prevent a party from engaging in a similar business in competition with the promise). Restrictive covenants are enforceable in North Carolina if "they are (1) in writing, (2) made part of a contract of employment, (3) based on valuable consideration, (4) reasonable both as to time and territory, and (5) not against public policy." Whittaker Gen. Med. Corp. v. Daniel, 379 S.E.2d 824, 826 (N.C. 1989). Defendants argue that the CAPRAA's restrictive covenants were not based on consideration and were unreasonable.

Plaintiffs contend that the restrictive covenants were supported by consideration in two alternative respects: (1) the covenants were supported by Murphy's new employment relationship when Collective Bias was acquired; and (2) they have sufficiently alleged that Murphy received additional benefits in exchange for signing the CAPRAA. Pl.s Resp. at 5. The Court will address each argument in turn.

Plaintiffs' first argument fails. "An employment contract signed at the time of a business acquisition may only use employment with the acquiring company as consideration if the old employment relationship is deemed *terminated* as a result of the transaction. Amerigas Propane, L.P. v. Coffey, No. 14 CVS 376, 2015 WL 6093207, at *5 (N.C. Super. Oct. 15, 2015) (emphasis added). Here, Plaintiff alleges that her prior employment relationship with Collective Bias was not terminated. Plaintiffs admit that after the acquisition "Collective Bias retained its name and continued to operate

as its own entity" and that "*its employees* were required to sign [the CAPRAA] with Inmar." Compl., ¶ 37. Further, Plaintiffs claim Murphy was not required to renew or sign any new employment agreements and that her employment was still governed by the CBA. Accordingly, Plaintiffs' cannot use Murphy's employment with Inmar as consideration for the CAPRAA, since they fail to allege her old employment relationship with Collective Bias was terminated.

Second, Plaintiffs fail to allege Murphy's signature of the CAPRAA was supported by new consideration. "When the employment relationship is established before the covenant not to compete is executed, there must be separate consideration to support the covenant, such as a pay raise or other employment benefits or advantages for the employee." Stevenson v. Parsons, 384 S.E.2d 291, 292–93 (N.C. App. 1989); James C. Greene Co. v. Kelley, 134 S.E.2d 166, 167 (N.C. 1964); Estate of Graham v. Morrison, 576 S.E.2d 355, 359 (N.C. App. 2003) ("Past consideration or moral obligation is not adequate consideration to support a contract."). "[North Carolina courts] have held the following benefits all meet the 'new' or 'separate' consideration required for a non-compete agreement entered into after a working relationship already exists: continued employment for a stipulated amount of time; a raise, bonus, or other change in compensation; a promotion; additional training; uncertificated shares; or some other increase in responsibility or number of hours worked. Hejl v. Hood, Hargett & Assocs., 674 S.E.2d 425, 428-29 (N.C. App. 2009). Plaintiffs do not allege any of these examples of consideration, rather they merely allege Murphy's signature was in exchange for "additional benefits." Compl., ¶ 37. This allegation is a threadbare recital of an element that Plaintiffs are required to allege for this claim. Thus, it is insufficient, even at the Rule 12(b)(6) stage. McReynolds v. Merrill Lynch & Co., 694 F.3d 873, 885 (7th Cir. 2012). Accordingly, Plaintiffs fail to sufficiently allege breach as to the CAPRAA's restrictive covenants.

Next, Plaintiffs allege that Murphy breached the CAPRAA Confidentiality Covenant. Initially, the Court notes that unlike restrictive covenants, North Carolina law permits continued employment to be sufficient consideration for a confidentiality agreement. See Amerigas Propane, 2015 WL 6093207,

at \*5 (citing <u>Sirona Dental, Inc. v. Smithson</u>, No. 3:14-cv-714-RJC-DSC, 2015 U.S. Dist. LEXIS 6080, at \*4 (W.D.N.C. Jan. 20, 2015). Defendants do not argue that the CAPRAA Confidentiality Covenant is unsupported by consideration, rather they argue that it is unenforceable since it is not limited in time or geographic scope, citing Illinois law in support. However, as stated above, the Court looks to North Carolina law to determine this matter.

Under North Carolina law, the CAPRAA Confidentiality Covenant is enforceable. "[North Carolina courts] have a long history of carefully scrutinizing covenants that preclude a seller of a business from competing with the new owner and covenants that prevent an employee from competing with his former employer." <u>Chemimetals Processing v. McEneny</u>, 476 S.E.2d 374, 376 (N.C. App. 1996). Yet, "[w]hen an agreement seeks to prevent the disclosure or use of confidential information and does not seek to prevent a party from engaging in a similar business in competition with the promise, it is not in restraint of trade. <u>Creative Snacks, Co., LLC v. Hello Delicious Brands LLC</u>, No. 1:17 CV 50, 2017 WL 4043564, at \*4 (M.D.N.C. Sept. 12, 2017). "Such agreements may, therefore, be upheld even though the agreement is unlimited as to time and area … upon a showing that it protects a legitimate business interest of the promisee." <u>Chemimetals</u>, 476 S.E.2d at 377.

Here, the CAPRAA Confidentiality Covenant is not a restraint on trade because it is limited to nonpublic information, *e.g.*, financial information, source code of proprietary software, research data, internal cost and pricing data. Protecting such information is within the legitimate business interest of Plaintiffs, and thus, the lack of restrictions on time and area do not render the clause unenforceable. Accordingly, the Court turns to whether Murphy breached the confidentiality agreement.

Plaintiffs argue that Murphy breached the CAPRAA Confidentiality Covenant in part when she forwarded emails that contained confidential information—business development plans, research, client pricing and marketing strategies, and other information that Plaintiffs allege is proprietary. Compl., at 13, 14. Then, upon Murphy's arrival at Ahalogy, she began to use the confidential information to benefit herself and Ahalogy. <u>Id.</u> at 15. Plaintiffs aver that Murphy's conduct decreased

15

the value of Plaintiffs' proprietary information and loss of business. These allegations sufficiently plead that Murphy breached the CAPRAA's confidentiality agreement.

Accordingly, Defendants' motion to dismiss Count IV is: (1) granted as it pertains to breach of the CAPRAA's restrictive covenants; and (2) denied as to Murphy breaching the confidentially agreement.

### E. Defendants' Alleged CFAA Violation (Count V)

Plaintiffs allege that Murphy and Ahalogy violated provision § 1030(a)(2)(c), (a)(5)(C), and (b) of the CFAA. The CFAA is primarily a criminal anti-hacking statute; however, it permits "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator." 18 U.S.C. § 1030(g). "[A] person suing under section 1030(g) must prove: (1) damage or loss (2) by reason of (3) a violation of some other provision of section 1030, and (4) conduct involving one of the factors set forth in section 1030(a)(5)(B)(i)-(v)." Motorola, Inc. v. Lemko Corp., 609 F. Supp. 2d 760, 765 (N.D. Ill. 2009). Here, Plaintiffs claim that Defendants violated the CFAA when Murphy exceeded her authorized access to Plaintiffs' proprietary information by forwarding the information to her personal email account. Defendants contend that these allegations do not sufficiently plead damages or loss under the CFAA.

As an initial matter, Plaintiffs are not required to plead both loss and damages, rather it is sufficient to allege either. Motorola, Inc., 609 F. Supp. 2d 767 (holding that to state a claim under § 1030(g) for violation of § 1030(a)(2) or (a)(5), a plaintiff is not required to allege both loss and damage, because such an interpretation would render the first sentence of § 1030(g) meaningless and lead to an "absurd" result). Plaintiffs argue that they have sufficiently pleaded loss under the CFAA. The term "loss" means "any reasonable costs to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). "Courts in this district have

found that to adequately plead a loss under CFAA, it is the plaintiff's burden to allege that a defendant's action caused losses over $5,000 in a one year period, relating to damages and security assessments." Segerdahl Corp. v. Ferruzza, No. 17 CV 3015, 2018 WL 828062, at *4 (N.D. Ill. Feb. 10, 2018) (collecting cases).

Plaintiffs claim that they suffered damages in excess of $5,000 from the cost of responding to Defendants' unlawful actions and conducting a damage assessment. Defendants argue that loss requires Plaintiffs to allege that the costs are associated with responding to an interruption of service or that an impairment of data occurred. The parties' respective arguments reflect a split in this circuit regarding what constitutes "loss" under the CFAA.  However, the Court remains unpersuaded by Plaintiffs argument. See TriTeq Lock & Sec. LLC v. Innovative Secured Sols., LLC, No. 10 CV 1304, 2012 WL 394229, at *1 (N.D. Ill. Feb. 1, 2012) (Norgle, J.). When enacting the FCAA, "Congress was concerned with ... attacks by virus and worm writers, on the one hand, which come mainly from the outside, and attacks by disgruntled employees who decide to trash the employer's data on the way out (or threaten to do so in order to extort payments), on the other." Int'l Airport Ctrs., L.L.C. v. Citrin, 440 F.3d 418, 420 (7th Cir. 2006).

As alleged, Murphy merely forwarded emails from her work computer to her personal email. Plaintiffs do not claim that Murhpy's conduct caused any impairment to the system, disrupted Plaintiffs' services, or rendered any of Plaintiffs' data even momentarily unavailable. Accordingly, "to permit a plaintiff to state a CFAA claim by simply alleging costs incurred in responding to an alleged offense or conducting a damage assessment without alleging that the offense caused damage would impermissibly broaden the applicability of the CFAA to provide seemingly unfettered access to federal courts to adjudicate state law issues incidental to computer use." TriTeq Lock, 2012 WL 394229, at *7. Other courts have taken a similar approach in interpreting "loss". See Mintel Int'l Grp., Ltd. v. Neergheen, No. 08-CV-3939, 2010 WL 145786, at *10 (N.D. Ill. Jan. 12, 2010) ("The alleged loss must relate to the investigation or repair of a computer or computer system following a violation that

caused impairment or unavailability of data or interruption of service."); SKF USA, Inc. v. Bjerkness, 636 F. Supp. 2d 696, 721 (N.D. Ill. 2009) (holding that where the defendants transferred data to a competitor without the plaintiff's authorization, the plaintiff's losses were better addressed under state contract and trade secrets law than under the CFAA); Cassetica Software, Inc. v. Computer Sciences Corp., No. 09 C 0003, 2009 WL 1703015, at *1 (N.D. Ill. June 18, 2009); Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc., No. 07 C 5902, 2009 WL 743215, at *1 (N.D. Ill. Mar. 19, 2009).

Further, the Court rejects Plaintiffs' argument that Fidlar Techs. v. LPS Real Estate Data Sols., Inc., overturned the cases cited above. 810 F.3d 1075 (7th Cir. 2016). Fidlar did not address what constitutes loss under the CFAA nor how it is defined. Id. Rather, the court in Fidlar only considered damages under § 1030(a)(5)(A). Thus, the Court does not find that Fidlar affects its analysis here. Id. at 22-25. For the reasons stated, Plaintiffs fail to allege loss under the CFAA. Accordingly, Count V is dismissed.

## F. Plaintiffs' Remaining Noncontractual Claims

### 1. Preemption under the ITSA

Defendants argue that the ITSA preempts Plaintiffs' remaining claims: tortious interference with contract, conversion, trespass to chattels, unjust enrichment, and civil conspiracy. The Court agrees in part. "[The ITSA] is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). "[T]here is no action for which [the plaintiffs'] seek recovery that is separate from the misappropriation of its trade secret information." Packaging v. Hein, No. 14 C 09670, 2015 WL 6164957, at *8 (N.D. Ill. Oct. 20, 2015); see also Hecny Transp., Inc. v. Chu, 430 F.3d 402, 404 (7th Cir. 2005) ("[The ITSA] abolishes claims other than those based on contract arising from misappropriated trade secrets, replacing them with claims under the Act itself."); Nat'l Auto Parts, Inc. v. Automart Nationwide, Inc., No. 14 C 8160, 2015 WL 5693594, at *4 (N.D. Ill. Sept. 24, 2015)

("Where a claim is predicated on the misuse of confidential or secret information, that claim is preempted by the ITSA."). Furthermore, "[e]ven if some of the information at issue does not rise to the level of a trade secret, the ITSA preempts claims of misappropriation of confidential information even if that information does not rise to the level of a trade secret." Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC, No. 14 C 4957, 2015 WL 3637740, at *17 (N.D. Ill. June 11, 2015) (citing Spitz v. Proven Winners North America, LLC, 759 F.3d 724, 733 (7th Cir. 2014)); Learning Curve Toys, L.P. v. PlayWood Toys, Inc., No. 94 C 6884, 1999 WL 529572, at *3 (N.D. Ill. July 19, 1999) (stating that even if the plaintiff's ideas do not meet the requirements of trade secrets, the plaintiff is not entitled to pursue common law causes of action for the defendant's alleged theft of ideas).

### 2. Ahalogy's tortious interference with the CBA and CAPRAA (Count VI)

Plaintiffs claims that Ahalogy tortiously interfered with their contractual relationship with Murphy governed by the CBA and the CAPRAA. First, Plaintiffs' tortious interference claim is dismissed to the extent that it relies on Murphy's breach of the CBA Confidentially Covenant and the CAPRAA Confidentiality Covenant or requirements to return Plaintiffs' confidential property back to Plaintiffs upon Murphy's resignation from Collective Bias. These claims are preempted by the ITSA because both arise directly from Plaintiffs' misappropriated trade secrets. Further, since Plaintiffs' breach of contract claim regarding the CAPRAA was dismissed—except for Plaintiffs' alleged violation of the CAPRAA Confidentially Covenant—Plaintiffs' tortious interference claim is dismissed to the extent it relies on Murphy's alleged breach of the CAPRAA.

Turning to the remaining alleged breaches of the CBA that are not based solely on the alleged misappropriation of trade secrets. "To succeed in proving that the defendant committed tortious interference with contract, the plaintiff must plead and prove: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contractual relationship between the plaintiff and another; (3) the defendant's intentional and unjustifiable inducement of a breach of the contract; (4) a breach of contract by the other caused by the defendant's

wrongful acts; and (5) damage to the plaintiff." Cress v. Rec. Servs., Inc., 795 N.E.2d 817, 842 (Ill. App. 2003).

Here, Plaintiffs fail to allege that Ahalogy intended Murphy to breach the CBA Non-Solicitation Covenant. The CBA Non-Solicitation Covenant prevents Murphy from soliciting Plaintiffs' customers who she had contact with or worked the account of during the twelve months preceding Murphy's resignation. Compl., Ex. A § 5(b). Plaintiffs allege that Murphy reached out to one of Plaintiffs' customers with whom she worked within the last twelve months of her employment with Plaintiffs. However, Plaintiffs do not claim that Ahalogy directed Murphy's conduct or was even aware of it. Plaintiffs further fail to allege that Ahalogy induced Murphy to reach out to any of Plaintiffs' customers that Murphy worked with while still employed by Plaintiffs.

Finally, the Court turns to Plaintiffs tortious interference claim regarding the CBA Non-Compete Covenant. As discuss *supra*, for the purposes of this motion, the Court has determined that the restrictive covenants contained in the CBA are enforceable. Plaintiffs allege that Ahalogy was aware of the CBA Non-Compete Covenant, it hired Murphy despite the covenant, and Murphy's subsequent employment with Ahalogy breached that covenant. These allegations are sufficient to allege tortious interference of contract. See PrimeSource Bldg., 2017 WL 7795125, at *12 (noting that the defendant's alleged recruitment and employment of the plaintiff's employees, knowing that they were subject to a non-competition clause, supported the plaintiff's tortious interference with contract claim); Equis Corp. v. Staubauch Co., No. 99 C 7046, 2000 WL 283982, at *1 (N.D. Ill. Mar. 13, 2000) (same). Thus, Plaintiffs have sufficiently alleged Ahalogy tortuously interfered with Plaintiffs' contract with Murphy, as the claim pertains specifically to the CBA Non-Compete Covenant.

### 3. Conversion and Trespass to Chattels (Counts VII and VIII)

For their conversion claim, Plaintiffs argue that Murphy, without authorization, obtained and denied return of Plaintiffs' property and confidential or proprietary information. Similarly, for their trespass to chattels claim, Plaintiffs aver that Defendants failed to return Plaintiffs' property and

confidential or proprietary information, instead using it for their own enrichment. The alleged property for both of these claims are the emails that Murphy forwarded to herself. These emails are the same property that serves as the basis for Plaintiffs' misappropriation of trade secrets claims. Thus, Plaintiffs' conversion and trespass to chattel claims are preempted by the ITSA. See Segerdahl Corp., 2018 WL 828062, at *6 (finding that where the plaintiff did not allege that the defendant took anything except copied emails of confidential information, the conversion claim was preempted by the ITSA.); AutoMed Techs., Inc. v. Eller, 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001) (finding preemption where the property in question was software and design plans, which were among the trade secrets allegedly misappropriated); Am. Ctr. for Excellence in Surgical Assisting, Inc. v. Cmty. Coll. Dist. 502, 190 F. Supp. 3d 812, 825 (N.D. Ill. 2016) (finding preemption where the plaintiff alleges the defendant converted proprietary information, but did not assert that any of the Proprietary Information's physical manifestations (such as text books) were relevant to the claim). Accordingly, Counts VII and VIII are dismissed without prejudice.

### 4. Defendants' Unjust Enrichment (Count IX)

As an initial matter, while Plaintiffs may seek relief under a theory of unjust enrichment as an alternative to relief sought under the contract claim, see Fed. R. Civ. P. 8(a)(3), they fail to do so here. In Count IX, Plaintiffs incorporate allegations of valid contractual agreements between Murphy and Plaintiffs. Compl ¶ 128 (incorporating each of the foregoing paragraphs, which included allegations of the CBA and CAPRAA). This alone provides a sufficient basis to dismiss Plaintiffs' unjust enrichment claim. See Cross v. Batterson, No. 17 C 198, 2017 WL 2798398, at *8 (N.D. Ill. June 28, 2017). Nevertheless, the Court will also determine whether Count IX is preempted under the ITSA.

"In Illinois, to state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." Cleary v. Philip Morris Inc., 656 F.3d 511, 516 (7th Cir. 2011) (internal quotation marks omitted).

Plaintiffs allege that by virtue of Defendants collecting and utilizing Plaintiffs confidential property, they unjustly retained a benefit to the detriment of Plaintiffs. Plaintiffs do not purport that Defendants were unlawfully enriched through Murphy's knowledge or expertise. Rather, the claim is exclusively predicated on possession of Plaintiffs' confidential information. Accordingly, Plaintiffs' unjust enrichment claim is dependent on trade secrets and is preempted. See Spitz v. Proven Winners N. Am., LLC, 759 F.3d 724, 733 (7th Cir. 2014) (finding that the ITSA preempted the plaintiff's unjust enrichment claim, even where the district court determined that the plaintiff's idea was not a trade secret); Segerdahl Corp. v. Ferruzza, No. 17 CV 3015, 2018 WL 828062, at *7 (N.D. Ill. Feb. 10, 2018). Accordingly Count IX is dismissed without prejudice.

### 5. Defendant's Civil Conspiracy (Count X)

For its civil conspiracy claim, Plaintiffs allege that Defendants agreed to access Plaintiffs' systems to obtain Plaintiffs' property and confidential or proprietary information. Since these allegations merely state that Defendants planned or engaged in unlawful acts in conjunction to take Plaintiffs' confidential information through improper means, Plaintiffs' civil conspiracy claim is another reiteration of the ITSA allegations, and thus, is preempted. See Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 975 (N.D. Ill. 2000) ("[D]ismissal of a conspiracy claim is warranted where it merely duplicates an underlying tort claim that has already been pled."); Learning Curve 1999 WL 529572, at *3 (N.D. Ill. July 19, 1999) ("[T]he alleged theft of ideas cannot support multiple claims under different theories of recovery.). Thus Count X is dismissed without prejudice.

### III.   CONCLUSION

For the aforementioned reasons, Defendants' motion to dismiss Plaintiffs' complaint is granted in part and denied in part. Defendants' motion to dismiss Counts I, II, and III is denied. Defendants' motion to dismiss Count IV is: (1) granted as it pertains to breach of the CAPRAA Non-Solicitation Covenant and the CAPRAA's Non-Compete Covenant; and (2) denied as to Murphy's alleged breach of the CAPRAA Confidentially Covenant. Defendants' motion to dismiss Count VI is: granted to the

extent it pertains to Ahalogy's tortious interference with the CAPRAA and the CBA Confidentiality

Covenant, the CBA Non-Solicitation Covenant, and the CBA Employer Property Covenant; and (2)

denied as to Ahalogy tortiously interfering with the CBA Non-Compete Covenant. Finally, the Court

grants Defendant's motion to dismiss Counts V, VII, VIII, IX, X. The Court makes clear that to the

extent any claim was dismissed, it dismissed without prejudice.

     IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: December 21, 2018