**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| INMAR, INC. and COLLECTIVE BIAS, INC.,<br><br>          Plaintiffs,<br><br>   v.<br><br>MONICA MURPHY VARGAS and MLW<br>SQUARED, INC., d/b/a AHALOGY,<br><br>          Defendants. | Case No: 18-cv-2306<br><br>Judge Charles R. Norgle |

**<u>DEFENDANT AHALOGY'S ANSWER TO THE COMPLAINT
AND AFFIRMATIVE DEFENSES</u>**

Defendant MLW Squared, Inc., d/b/a Ahalogy ("Ahalogy"), by its attorneys, for its Answer

and Affirmative Defenses to the Complaint for Injunctive and Other Relief filed by Plaintiffs

Inmar, Inc. ("Inmar") and Collective Bias, Inc. ("Collective Bias"), states as follows:

**NATURE OF THE ACTION**

1.     This is a case about a former employee violating her non-compete, non-solicitation, and non-disclosure of confidential information agreements with her former employer; stealing from that former employer; and her new employer assisting, encouraging, and benefitting from that former employee's unlawful conduct.

**<u>ANSWER:</u>**    **Ahalogy denies the allegations contained in Paragraph 1.**

2.     Defendant Murphy was an employee of Plaintiffs for approximately two years, during which time she had access to and made use of Plaintiffs' confidential and proprietary information in the course of her employment. Consequently, she was asked, and agreed, to be bound by contracts with Plaintiffs that required her to maintain the confidentiality of that information during and after her employment. Plaintiffs have learned, however, that notwithstanding those agreements, Defendant Murphy stole that information and used it for her own benefit and that of her new employer, Defendant Ahalogy.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in the first two sentences of Paragraph 2, and therefore denies these allegations. Ahalogy denies the allegations contained in the third sentence of Paragraph 2.**

3.      Furthermore, Defendant Murphy also promised that if she left the employment of Plaintiffs, she would not immediately go to a competitor or attempt to steal Plaintiffs' clients. Plaintiffs have learned that Defendant Murphy violated those promises, too—after she left Plaintiffs, she accepted a position at Defendant Ahalogy (a company she knew was a direct competitor of Plaintiffs) and began stealing and attempting to steal Plaintiffs' confidential and proprietary information and clients.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in the first sentence of Paragraph 3, and therefore denies these allegations. Ahalogy denies the allegations contained in the second sentence of Paragraph 3.**

4.      In sum, Defendants Murphy and Ahalogy have engaged in a systemic and unlawful effort to undermine Plaintiffs' business. Plaintiffs are entitled to an injunction to stop this activity, and damages to compensate them for it.

**ANSWER:** **Ahalogy denies the allegations contained in Paragraph 4.**

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Count One is brought pursuant to the federal Defend Trade Secrets Act and Count Five is brought pursuant to the federal Computer Fraud and Abuse Act, and pursuant to 18 U.S.C. § 1836(c), which provides that "[t]he district courts of the United States shall have original jurisdiction of civil actions brought under [the Defend Trade Secrets Act]."

**ANSWER:** **Ahalogy admits the allegations contained in Paragraph 5.**

6.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because Counts Two through Four and Counts Six through Ten are together related to and form part of the same case and controversy as Counts One and Five.

**ANSWER:** **Ahalogy admits the allegations contained in Paragraph 6.**

7.     The Court has personal jurisdiction over the Defendants.

**ANSWER:     Ahalogy admits the allegations contained in Paragraph 7.**

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and a substantial part of property that is the subject of the action is situated in this District.

**ANSWER:     Ahalogy admits the allegations contained in Paragraph 8.**

## PARTIES

9.     Plaintiff Inmar is a North Carolina Corporation. Its primary place of business and corporate headquarters is located at 635 Vine St., Winston Salem, North Carolina.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 9, and therefore denies these allegations.**

10.     Plaintiff Collective Bias is a Delaware Corporation. Its primary place of business and corporate headquarters is located at 1750 S. Osage Springs Dr., Rogers, Arkansas. It is a subsidiary of Inmar.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 10, and therefore denies these allegations.**

11.     Defendant Murphy is an individual and resident of Illinois.

**ANSWER:     Ahalogy admits the allegations contained in Paragraph 11.**

12.     Defendant Ahalogy is a Delaware Corporation. Its primary place of business and corporate headquarters is located at 3197 Linwood Ave., Cincinnati, Ohio.

**ANSWER:     Ahalogy admits the allegations contained in Paragraph 12.**

## FACTS

**Collective Bias and its Business**

13.     Collective Bias is an influencer marketing company based in Arkansas with other offices and employees in San Francisco, Minneapolis, Chicago, Cincinnati, and New York City.

It was one of the first companies to enter the modern influencer-marketing space in 2009, and it is a leader in modern influencer marketing and its measurement.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 13, and therefore denies these allegations.**

14.     Influencer marketing is a form of marketing where a seller leverages the popularity and credibility of specific individuals to market a product in a testimonial manner.

**ANSWER:** **Ahalogy denies the allegations set forth in Paragraph 14 as an incomplete and inaccurate characterization of the form and history of "influencer marketing."**

15.     Traditional influencer marketing often took the form of celebrity endorsements of products in marketing and advertising materials, wherein a celebrity (presumed to be influential based on that celebrity) received payment to endorse a product, and that endorsement was placed in traditional mass media (a television advertisement or a magazine).

**ANSWER:** **Ahalogy denies the allegations set forth in Paragraph 15 as an incomplete and inaccurate characterization of the form and history of "traditional influencer marketing."**

16.     Modern influencer marketing, however, eschews that model in favor of using a broader array of individuals who wield measurable influence (through "likes" and "followers", for example) on a broader array of platforms, particularly social media (such as Facebook, Instagram, Twitter, Snapchat, Pinterest, YouTube, and various blogs).

**ANSWER:** **Ahalogy denies the allegations set forth in Paragraph 16 as an incomplete and inaccurate characterization of the form and history of "modern influencer marketing."**

17.     Traditional influencer marketing is relatively simple; it might involve filming a television commercial in which a celebrity endorses a product that the celebrity is seen using (such as Lucille Ball and Desi Arnaz endorsing Phillip Morris brand cigarettes during the I Love Lucy television program)[1]. The message is simple: someone famous, wealthy, or attractive (and likely all three) uses the product, and if you want to be famous, wealthy, and/or attractive (or perceived as such), you should use the product, too.

---

[1] https://www.youtube.com/watch?v=z1ALtcAO69M

**ANSWER:** **Ahalogy denies the allegations set forth in Paragraph 17 as an incomplete and inaccurate characterization of the form and history of "traditional influencer marketing."**

18.     Much of modern influencer marketing, on the other hand, is more complex and the message involves more substance: the premise is that someone who is a lot like you (i.e., who shares your background, interests, and/or lifestyle) shows you that they use a product, explains how and why they use that product in their everyday life, and explains how and why you might want to, too. Modern influencer marketing also often uses dozens of influencers for a particular campaign as opposed to using a single celebrity endorser.

**ANSWER:** **Ahalogy denies the allegations set forth in Paragraph 18 as an incomplete and inaccurate characterization of the form of "modern influencer marketing."**

19.     For example, http://millionmoments.net is a blog written by "Jess," who describes herself in part as follows:

> I'm Mama to Judah and Kaia, two crazy kids that rock my world. I'm a huge DIY fan who loves working with my hands. My garden is my pride and joy, my camera goes just about everywhere I go. A Million Moments is a blog about family, food, crafts, travel, and all things creative with an emphasis on stellar photography. I am passionate about vegetarian cooking and providing a full, natural and fun life for my kids the best way I know how. We live a laid back life, we love the outdoors, and trying new things is deeply important to us.[2]

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 19, and therefore denies these allegations.**

20.     When a Collective Bias client wanted to promote its products through influencer marketing, Collective Bias coordinated with Jess and influencers like her, and Jess and those other influencers authored blog posts explaining what they liked about the product and ways to use the product (in Jess's case, by providing step-by-step instructions for creating a gift basket featuring the product).[3]

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 20, and therefore denies these allegations.**

---

[2] http://millionmoments.net/about
[3] http://millionmoments.net2013/12/adorable-last-minute-diy-gift-bigelow-tea.html

21.     This type of marketing activity is much more targeted and its impact much more measurable. To be most effective, it requires (i) a detailed understanding of the sellers' business and product or service being offered (in order to identify influencers who might be interested in the product or service and able to credibly represent their interest in and use of the product) and (ii) familiarity and relationships with many thousands of influencers and an understanding of their followers (in order to identify which would most effectively reach buyers of the product or service).

**ANSWER:     Ahalogy denies the allegations contained in Paragraph 21.**

22.     In order to sell one's influencer marketing services effectively, one must also research and develop contacts among the sellers and have a thorough understanding of their business and marketing plans and priorities.

**ANSWER:     Ahalogy admits one must develop contacts among sellers and denies the remaining allegations contained in Paragraph 22.**

23.     Collective Bias has spent years and millions of dollars not only developing the knowledge of products and influencers in order to offer the best services to its clients, but also developing contacts at major brands and building dossiers regarding those brands in order to most effectively sell its influencer marketing services to those brands.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 23, and therefore denies these allegations.**

24.     For example, Collective Bias has invested significant time and money in developing its Social Fabric® community, Shopper Social Media™ platform, and Prescriptive IQ™ platform.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 24, and therefore denies these allegations.**

25.     Social Fabric® is a technology platform that was created using proprietary research strategies to help Collective Bias identify influencers for particular products and services, as well as to provide opportunities for those influencers.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 25, and therefore denies these allegations.**

26.     Shopper Social Media™ is a technology platform that leverages a variety of data points (including data generated by Social Fabric®) to improve efficiency and effectiveness of influencer marketing efforts.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 26, and therefore denies these allegations.**

27.     Prescriptive IQ™ is a platform that analyzes and synthesizes purchase data from Inmar, social data, market research, and engagement data in order to generate a marketing strategy recommendation (i.e., which influencers to use in order to ensure that the campaign reaches the right audience with the right content in the right place at the right time).

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 27, and therefore denies these allegations.**

28.     These services were built with proprietary research and they use proprietary methods to harness the power of consumer recommendation and endorsement across thousands of websites and millions of social media connections to connect authentic, real-life influencer content with key audiences using advanced analytics and behavior tracking. These platforms (along with the data gathered to build them and the data gathered through them) set Collective Bias apart from its competitors by enabling it to provide services and insights at a level that its competitors cannot.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 28, and therefore denies these allegations.**

**Collective Bias Hires Defendant Murphy**

29.     On or about November 19, 2015, Defendant Murphy accepted an offer of employment with Collective Bias to serve as its Senior Director of Business Development.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 29, and therefore denies these allegations.**

30.     In exchange for the offer of new employment, Defendant Murphy was asked to (and agreed to) sign an employment agreement (the "Employment Agreement"), a copy of which is attached hereto as Exhibit A and incorporated herein by reference.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 30, and therefore denies these allegations.**

7

31.     Following execution of the Employment Agreement, Defendant Murphy became a fulltime employee of Collective Bias.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the**

**allegations contained in Paragraph 31, and therefore denies these allegations.**


32.     To facilitate the performance of her duties, Defendant Murphy was issued a keycard to access Collective Bias's secure facilities, issued a laptop computer on which to conduct business, and provided with an email account and login credentials that provided her access to Collective Bias's interstate computer network. Defendant Murphy's duties included using that laptop, email account, login credentials, and interstate computer network to communicate with Collective Bias's employees, clients, and prospective clients, all of whom are and were at all relevant times located nationwide.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the**

**allegations contained in Paragraph 32, and therefore denies these allegations.**


33.     As the Senior Director of Business Development, Defendant Murphy had numerous responsibilities, including:

    a.     Being an expert on all things social media, Collective Bias history, product offerings, positioning, pricing, and competitor differences;

    b.     Developing, managing, and tracking a territory/account plan to meet quarterly and annual sales goals;

    c.     Effectively prospecting potential clients through personal consumer packaged goods, retail, agency, and supplier networks and other lead sources (including cold calling);

    d.     Understanding client business objectives, proposing and closing strategic solutions leveraging Collective Bias products, rate card, budget template, and timeline standards;

    e.     Retaining existing business and continually searching for ways to grow that business;

    f.     Utilizing salesforce.com for prospect tracking, opportunity identification and internal communication;

    g.     As the primary sales conduit for assigned clients, attending kick-off, post-analysis and other important meetings with clients as a means to sell additional Collective Bias services; and

       h.     Collaborating with specified Client Services teams to oversee accounts from proposal through post-analysis to resell.

**ANSWER:**   **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 33, and therefore denies these allegations.**

34.    In that role, Defendant Murphy had access to and made use of Collective Bias's property and its confidential and proprietary information, including information regarding Collective Bias's product offering, positioning in the market, pricing, competitive differentiators, territory and account plans, lead sources, client business objectives, rate cards, budget templates, timeline standards, business opportunities, client lists, decision-maker contact information, and research dossiers.

**ANSWER:**   **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 34, and therefore denies these allegations.**

35.    Defendant Murphy also had access to the propriety aspects of the Social Fabric® community, Shopper Social Media™ platform, and Prescriptive IQ™ platform, and used that information in the performance of her duties.

**ANSWER:**   **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 35, and therefore denies these allegations.**

**Inmar Acquires Collective Bias**

36.    Inmar is a technology and data science company with offices throughout the United States that provides insights and solutions to the following groups:

       a.     to manufacturers to help them engage shoppers, optimize logistic efficiencies, and protect assets;

       b.     to retailers to help them drive traffic, maximize storewide profitability, and reduce unsaleable products;

       c.     to hospitals, health systems, and pharmacies to help them enhance operations, protect profitability, and improve patient outcomes;

       d.     to government agencies to help them handle their revenue recovery, inventory management, business analytics, and consumer technology programs; and

e.    to shoppers to help them access promotions, care for their families, and live healthier lives.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 36, and therefore denies these allegations.**

37.    In or around December 2016, Inmar acquired Collective Bias. After the transaction, Collective Bias retained its name and continued to operate as its own entity, but its employees were required to sign another agreement with Inmar-the Confidential and Proprietary Rights Assignment Agreement (the "CAPRAA").

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 37, and therefore denies these allegations.**

38.    In exchange for employment with Inmar and the additional benefits associated therewith, Defendant Murphy was asked, and agreed, to sign the CAPRAA, a copy of which is attached hereto as Exhibit B and incorporated herein by reference.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 38, and therefore denies these allegations.**

39.    Defendant Murphy continued to have access to and use Collective Bias's property and its confidential and proprietary information, but now also had access to and used Inmar's property and confidential information.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 39, and therefore denies these allegations.**

**Ahalogy and its Business**

40.    Ahalogy, like Collective Bias, is an influencer marketing company. It describes itself as a company that "deliver[s] proven [return on investment] through category trend data, authentic influencer content, and social optimization technology."[4]

**ANSWER:** **Ahalogy denies the allegations contained in the first sentence of Paragraph 40 as an incomplete and therefore inaccurate characterization of the business of Ahalogy.**

---

[4] http://www.ahalogy.com/about

**Ahalogy denies the allegations contained in the second sentence of Paragraph 40 as an incomplete and inaccurate summary of statements on Ahalogy's website. Ahalogy directs Plaintiffs to the full contents of Ahalogy's website for purposes of completeness and accuracy.**

41.     Ahalogy engages in the same form of modern influencer marketing as does Collective Bias. For example, Ahalogy highlights on its website a program it implemented for a client, explaining: "When it comes to inspiring readers with one-of-a-kind recipes and new ways to use their favorite products, influencers do it best. See how our Partners helped drive awareness of 7UP at Target with our data-driven Brandables solution. The seasonal cocktail recipes were inspired by ingredient trend data discovered in Muse."[5]

**ANSWER:     Ahalogy denies the first sentence of Paragraph 41. Ahalogy denies the allegations contained in the remaining sentences of Paragraph 41 as an incomplete and inaccurate summary of the contents of Ahalogy's website. Ahalogy directs Plaintiffs to the full contents of Ahalogy's website for purposes of completeness and accuracy.**

42.     One of those cocktail recipes was authored by "Madison" on her blog https://www.joyfullymad.com, who describes herself as follows:

> Hey y'all! Welcome to A Joyfully Mad Kitchen, I'm so glad you found this space! I'm Madison and I am the recipe developer, taste-tester, food photographer, and writer behind this blog.
>
> On this blog you'll find the tried and true recipes that my family and I eat and love to serve to friends and family. Each of the recipes on this blog is food that we actually eat in our house. With a toddler in our family, I'll always try to share recipes that the whole family will enjoy - but I won't blame you if you hide the cupcakes from your kids. I get it. ;)[6]

**ANSWER:     Ahalogy admits that the quoted paragraphs appear on the website listed above. Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the remaining allegations contained in Paragraph 42, and therefore denies these allegations.**

---

[5] http://www.ahalogy.com/muse
[6] https://www.joyfullymad.com/about-me/

11

43.    The blog post on A Joyfully Made [sic] Kitchen that Ahalogy coordinated explained what Madison liked about shopping at Target and why she used 7Up in her recipe (and provided step- by-step instructions for creating a Cherry Sorbet Bellini party cocktail).[7]

**ANSWER:**    **Ahalogy does not author the blog posts alleged in Paragraph 43, and lacks knowledge as to the specific language used therein. Ahalogy directs Plaintiffs to the website blog posts on "A Joyfully Mad Kitchen" for purposes of completeness and accuracy. Ahalogy admits that it coordinated this specific blog post.**

44.    Ahalogy touts its own propriety services "Muse" and "Brandables," and claims that "Muse is the only place to find influencer trend data."[8]

**ANSWER:**    **Ahalogy admits that Muse and Brandables are its own proprietary products that are noted on its website. Ahalogy directs Plaintiffs to the full contents of Ahalogy's website for purposes of completeness and accuracy of how it publicly describes these products.**

45.    Ahalogy also expressly compares itself to Collective Bias when pitching new clients, claiming that in a competition between the two, "Ahalogy wins" because its products are supposedly more effective in reaching potential consumers.

**ANSWER:**    **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 45, and therefore denies these allegations**

46.    Ahalogy also offers products and services that compete with Inmar's products and services, claiming to have access to significant amounts of data that permit it to advise on engagement with shoppers and help retailers drive traffic and maximize storewide profitability.

**ANSWER:**    **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 46, and therefore denies these allegations**

---

[7] https://www.joyfullymad.com/cherry-sorbet-bellini/
[8] http://www.ahalogy.com/muse

**Defendant Murphy Leaves Plaintiffs for Ahalogy**

47. Defendant Murphy knew that Ahalogy was a direct competitor of Plaintiffs—she was told precisely that by another employee of Plaintiffs. Indeed, she publicly admitted in January 2018 that she has been in the same line of work for the last five years: influencer marketing.[9]

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 47, and therefore denies these allegations.**

48. Nevertheless, on or about July 12, 2017, and for the express purpose of discussing potential employment at Ahalogy, Defendant Murphy authorized a recruiter from a talent firm called Hunt Club to contact her at the work email address provided to her by Collective Bias.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 48, and therefore denies these allegations.**

49. Indeed, when she authorized the recruiter to reach out to her, Defendant Murphy knew that the recruiter was reaching out regarding the position of Director of Sales – West at Ahalogy, and she knew that the role would entail leading sales efforts to grow Ahalogy's influencer and content marketing business: the email she received included a detailed job description.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 49, and therefore denies these allegations.**

50. The job description and qualifications for the role at Ahalogy that Defendant Murphy received is nearly identical to the job description for the role she held at Collective Bias (copies of which are attached as Exhibits C and D):

Collective Bias: A Director of Business Development builds relationships and closes business for Collective Bias. This position will ideally be part "hunter"/part "strategist". Typical clients consist of shopper marketing budget holders at brands (primarily CPG), brands themselves, retailers and agencies. Direct contacts are usually at senior manager/director level positions, but also include VP/CMO. A Director of Business Development at CB should have an entrepreneurial spirit, be a good listener, lean in mentality and be passionate about social media.

Ahalogy: As a Sales Director at Ahalogy you will lead all sales efforts to grow their influencer and Content Marketing business with large brands and agencies in the Western region. Sales Directors are the backbone of each region, acting as the first line of offense in territory account acquisition. The focus of the role is on opening

---

[9] http://www.ahalogy.com/blog/the-new-ahalogists-were-expanding-our-team-in-cincinnati-3

new relationships and delivering a growing amount of RFP opportunities from the agencies and brands you have met with. You will be supported by strong, dedicated SDR and Client Success resources, which help secure meetings and deliver proposals.

**ANSWER:**     **Ahalogy denies the allegations contained in Paragraph 50.**

51.     Likewise, the description of duties and qualifications overlap, with some examples highlighted below:

| **Ahalogy** | **Collective Bias** |
|---|---|
| "Fluency in digital media vernacular with a deep interest in native social platforms (e.g., Pinterest, Twitter, Facebook)" | "Be an expert on all things social media" and knowledge and understanding of social media platforms" |
| "Act as a first line of offense for product demos, proposals, pricing" and "evangelize the Ahalogy solution" | "Be an expert on . . . product offering, positioning, pricing, and competitor differences" |
| "Prospect within the Western territory" | "Effectively prospect potential clients" |
| "Meet and exceed individual and team revenue targets" | "Develop, manage, and track a territory/account plan to meet quarterly and annual sales goals" |
| "Experience routinely closing five and six-figure contracts" | "Proven ability to identify and close $100K+ deals" |
| "Preferred experience with CPG and Retail Brands, and Shopper marketing experience" | "Typical clients consist of shopper marketing budget holders at brands (primarily CPG), brands themselves, retailers and agencies" |

**ANSWER:**     **Ahalogy denies the allegations contained in Paragraph 51.**

52.     Shortly thereafter, Ahalogy interviewed Defendant Murphy and eventually offered her the role of Director of Sales at Ahalogy. Their reasoning for doing so was clear in their job description—if the Director of Sales was to be the "first line of offense," there could be no better weapon than an employee who held that same role at their main competitor.

**ANSWER:**     **Ahalogy admits the allegations contained in the first sentence of Paragraph 52.**

**Ahalogy denies the remaining allegations contained Paragraph 52.**

14

53.     Defendant Murphy did not inform Plaintiffs of her impending departure until early evening on August 24, 2017.

**ANSWER:**     **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 53, and therefore denies these allegations.**

54.     After accepting the offer from Ahalogy but prior to notifying Plaintiffs, Defendant Murphy, for her own personal benefit and for the benefit of Ahalogy, accessed and collected Plaintiffs' confidential information using her credentials to access Plaintiffs' computer systems and facilities, her work-issued computer, and her Collective Bias email account. Those actions included (but were not limited to) sending the following information to her personal email account:

a.     On August 4, 2017, Defendant Murphy forwarded an internal email from earlier that day containing (i) the names and contact information for decision-makers at a client, (ii) an explanation of the service Plaintiffs were offering and how the service worked, and (iii) a summary of Plaintiffs' discussions with the client and the business development plans for this client.

b.     On August 14, 2017, Defendant Murphy forwarded an internal email from earlier that week containing research conducted by Plaintiffs regarding the nationwide distribution of brand names for a client and discussing how this research would be helpful for more accurate targeting.

c.     Later that same day, Defendant Murphy forwarded another internal email from earlier that week containing (i) research conducted by Plaintiffs regarding a client's pricing and marketing strategies, and (ii) a discussion regarding opportunities for Plaintiffs to pitch their business or modify their pitch to the client based on such research.

d.     On August 15, 2017, Defendant Murphy forwarded an internal email from earlier that day containing (i) Plaintiffs' research regarding a client's challenges with regard to sales, and (ii) a discussion regarding how Plaintiffs should respond.

e.     On August 17, 2017, Defendant Murphy forwarded an internal email from the prior day containing (i) Plaintiffs' research regarding a client's marketing priorities, (ii) a discussion regarding how Plaintiffs should respond, and (iii) a list of over a dozen potential clients with whom Plaintiffs had recently been negotiating.

f.     Shortly thereafter, Defendant Murphy forwarded an internal email from that morning containing (i) Plaintiffs' research regarding developments in a subset of the beverage industry and (ii) the identity of a contact to provide leads for new business.

g.      Later that afternoon, Defendant Murphy forwarded an internal email chain dating back to July 2017 between Defendant Murphy and two points of contact at a client containing (i) Plaintiffs' marketing strategy and talking points for pitching business, (ii) the names and contact infom1ation for decision-makers at the client, and (iii) a discussion regarding the client's use of influencer marketing.

**ANSWER:**    **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 54, and therefore denies these allegations.**

55.    It was not until early evening on August 24, 2017, that Defendant Murphy tendered her letter of resignation, effective immediately. And yet, that same day she continued forwarding emails to her personal account. Indeed, she forwarded one from earlier that month (containing detailed research regarding a client's media and marketing strategy and a discussion of the impact on Plaintiffs' business strategy) less than an hour before she tendered her resignation.

**ANSWER:**    **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 55, and therefore denies these allegations.**

56.    Upon her arrival at Ahalogy, Defendant Murphy immediately began using the information she had stolen from Plaintiffs for her benefit and the benefit of Ahalogy.

**ANSWER:**    **Ahalogy denies the allegations contained in Paragraph 56.**

57.    For example, minutes before she tendered her resignation on August 24, 2017, Defendant Murphy had reached out to inform a specific client of Plaintiffs that she was leaving Plaintiffs. Roughly a month later and after she had joined Ahalogy, she reached out to this same client directly to inform the client that she had moved to Ahalogy, requested a meeting to pitch Ahalogy's services, and included a paragraph-long description explaining "What Makes Ahalogy different"—the clear implication being that what made Ahalogy different is also what made Ahalogy better than Plaintiffs.

**ANSWER:**    **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 57, and therefore denies these allegations.**

**The Terms of the Employment Agreement**

58.    The Employment Agreement with Collective Bias that Defendant Murphy signed includes a "Confidentiality" provision pursuant to which Defendant Murphy acknowledged and agreed that in the course of her employment, she would have access to broad categories of "Confidential and Propriety Information" (as defined therein) and that she would treat such

16

information as confidential, not use such information except in furtherance of the business of Collective Bias, and not deliver copies of the information to anyone except to the extent authorized by Collective Bias or required in the ordinary course of her employment.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 58, and therefore denies these allegations. Ahalogy further denies any attempt by Plaintiffs to summarize or re-characterize the language used in any legal agreement and refers to the entirety of the agreement for completeness and accuracy of its contents and the legal implications thereof.**

59.     The Employment Agreement includes a "Client Information" provision pursuant to which Defendant Murphy acknowledged and agreed that in the course of her employment, she would have access to broad categories of confidential information of Collective Bias's clients, and that she would not disclose such information to anyone without Collective Bias's consent, and that upon termination of her employment, she would return to Collective Bias "all property of any client or prospective client of Employer" that was in her possession.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 59, and therefore denies these allegations. Ahalogy further denies any attempt by Plaintiffs to summarize or re-characterize the language used in any legal agreement and refers to the entirety of the agreement for completeness and accuracy of its contents and the legal implications thereof.**

60.     The Employment Agreement includes an "Employer Property" provision pursuant to which Defendant Murphy acknowledged and agreed that all property of Collective Bias (including customer lists and other items relating to the business of Collective Bias) coming into her possession during the course of her employment would remain the property of Collective Bias, and that upon termination of her employment, she would return it to Collective Bias "immediately."

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 60, and therefore denies these allegations. Ahalogy further denies any attempt by Plaintiffs to summarize or re-characterize the language used**

17

in any legal agreement and refers to the entirety of the agreement for completeness and accuracy of its contents and the legal implications thereof.

61.     The Employment Agreement also includes a "Restrictive Covenants" provision pursuant to which Defendant Murphy acknowledged and agreed to the following reasonable restrictions:

a.      NON-COMPETE. Employee agrees that during the term of employment and for a period of one (1) year following the termination of Employee's employment, with or without cause, with or without notice, by either party, Employee will not, directly or indirectly, render services to any social media or shopper marketing company or agency in the United States that is a direct competitor to any account to which Employee was principally assigned at any point during the twelve (12) month period preceding his/her separation with the Company.

b.      Employee agrees that during the term of employment and for a period of one (1) year, following the termination of Employee's employment, with or without cause, with or without notice, by either party, Employee will not, directly or indirectly solicit any customer or potential customer of Employer with whom Employee had contact or for whose account Employee worked during the last twelve (12) months of Employee's employment with Employer.

c.      Employee agrees that for a period of one (1) year following the termination of Employee's employment, with or without cause, with or without notice, by either party, Employee will not, directly or indirectly attempt to encourage, induce, or otherwise solicit, directly or indirectly, any other employee of Employer to breach his or her employment agreement with Employer or to otherwise interfere with the advantageous business relationship of Employer with its employees.

d.      Employee further acknowledges that: (1) in the event his/her employment with the Employer terminates for any reason, he/she will be able to earn a livelihood without violating the foregoing restrictions and that (2) that his/her ability to earn a livelihood without violating such restrictions is a material coordination to his/her employment with Employer.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 61, and therefore denies these allegations and further denies that the alleged agreement is reasonable.  Ahalogy further denies any attempt by Plaintiffs to summarize or re-characterize the language used in any legal agreement and**

18

refers to the entirety of the agreement for completeness and accuracy of its contents and the legal implications thereof.

62. Defendant Murphy also agreed that any breach by her of the Employment Agreement could not reasonably or adequately be compensated in damages in an action at law, and that Collective Bias would be entitled to an injunctive relief to vindicate its rights under the Employment Agreement.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 62, and therefore denies these allegations. Ahalogy further denies any attempt by Plaintiffs to summarize or re-characterize the language used in any legal agreement and refers to the entirety of the agreement for completeness and accuracy of its contents and the legal implications thereof.**

**The Terms of the CAPRAA**

63. The CAPRAA that Defendant Murphy also signed includes a "Disclosure and Usage Restrictions" provision pursuant to which Defendant Murphy acknowledged and agreed that she would not disclose or permit access to the "Confidential Information" (as defined therein) of Inmar and its subsidiaries (the "Company") except to other employees in the good faith performance of her employment duties or with the authorization of the Company, and that she "would not use the Company's Confidential Information for any purpose other than performing services for and on behalf the Company" within the proper scope of her job duties.

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 63, and therefore denies these allegations**

64. The CAPRAA includes a "Publications" provision pursuant to which Defendant Murphy acknowledged and agreed that she would not publish or submit for publication or otherwise share the Company's Confidential Information because such disclosure could cause harm to the Company, including "by eliminating or diminishing the Company's or its Affiliates' competitive advantage."

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 64, and therefore denies these allegations. Ahalogy further denies any attempt by Plaintiffs to summarize or re-characterize the language used**

19

in any legal agreement and refers to the entirety of the agreement for completeness and accuracy of its contents and the legal implications thereof.

65.     The CAPRAA includes a "Confidential Treatment of Third Party Information" provision pursuant to which Defendant Murphy acknowledged and agreed that in the course of her employment, she would have access to broad categories of confidential information of third parties (such as the Company's clients), and that she would hold such information in the strictest confidence and not use that information unless such use is permitted by the Company or the third party.

**ANSWER:**     **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 65, and therefore denies these allegations.**

66.     The CAPRAA includes a "Tangible Materials" provision pursuant to which Defendant Murphy acknowledged and agreed that the Company retained sole ownership rights in all tangible materials provided to her by the Company and all tangible embodiments of and copies of "Proprietary Work Product" (as defined therein) and the Company's Confidential Information.

**ANSWER:**     **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 66, and therefore denies these allegations.**

67.     The CAPRAA includes a "General Duty of Loyalty Provision" pursuant to which Defendant Murphy acknowledged and agreed that during her period of employment, she owed the Company a general duty of loyalty, and further acknowledged and agreed that (among other things) she would not (i) usurp or divert for her own account or for any third party any business opportunity or potential business opportunity for the Company, (ii) interfere with the Company's existing business relationships, or (iii) compete against the Company's then-existing business or business plans.

**ANSWER:**     **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 67, and therefore denies these allegations.**

68.     The CAPRAA also includes a "Covenant Not To Compete" provision pursuant to which Defendant Murphy agreed to the following reasonable restrictions:

You covenant and agree that during the "Non-Competition Period" and within the "Non-Competition Area," as defined below, you shall not engage in the "Business," as defined in Section 11 below in the same or substantially similar capacity in which you engaged in the Business on behalf of the Company. Specifically, but without limiting the foregoing, you agree that during such period and within such area, you

20

shall not do any of the following: (a) be an owner of any capital stock, other equity securities or ownership interests of any Business Entity (as defined herein) that conducts a business of a like or similar nature to the business; provided however that you may own up to five percent (5%) of the stock of a corporation traded on a national securities market in the United States of America or Canada; or (b) be an employee, officer, director, principal, agent, consultant, lender to, independent contractor or trustee of any Business Entity or other person that conducts a business of a like or similar nature to the business.

**ANSWER:** **Ahalogy denies the restrictions are reasonable. Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the remaining allegations contained in Paragraph 68, and therefore denies these allegations. Ahalogy further denies any attempt by Plaintiffs to summarize or re-characterize the language used in any legal agreement and refers to the entirety of the agreement for completeness and accuracy of its contents and the legal implications thereof.**

69.    The CAPRAA defines "Business Entity" as "[a]ny corporation, sole proprietorship, general or limited partnership, limited liability company, joint venture, trust, unincorporated association or any other business entity."

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 69, and therefore denies these allegations**

70.    The CAPRAA defines "Non-Competition Period" as follows:

[T]he period of your employment with the Company (the "Employment Term") and for a period of two (2) years after termination of the employment relationship between the parties for any reason (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants set forth herein.)

**ANSWER:** **Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 70, and therefore denies these allegations.**

21

71.     The CAPRAA defines "Non-Competition Area" as "the entire United States of America and Canada" based on Defendant Murphy's acknowledgement and agreement that:

> [T]he Company does business on a nationwide basis in the United States of America and Canada, and that a breach of your covenants contained herein would immeasurable and irreparably damage the Company, regardless of the area in which the competing business is located in which the activities constituting such breach were to occur.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 71, and therefore denies these allegations.**

72.     The CAPRAA defines "Business" as "any business or service engaged in, as well as any new products or service offerings for which there is substantial development or market launch plans, by the Company or any of its Affiliates for which you have provided services during the term of your employment."

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 72, and therefore denies these allegations.**

73.     The CAPRAA also includes a "Non-Solicitation Covenant" provision pursuant to which Defendant Murphy agreed to that during the Non-Competition Period, she would not:

> a.     [F]or yourself, or on behalf of any other person or Business Entity solicit, divert or take away, or attempt to solicit, divert, or take away any of the customers, or prospective customers of the Company with whom you had contact during the twelve (12) months prior to the termination of your employment relationship with the Company; or (b) induce (or assist any other person to induce) any person to leave the employ of the Company.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 73, and therefore denies these allegations.**

74.     Defendant Murphy agreed that the foregoing restrictions are reasonable.

**ANSWER:     Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in Paragraph 74, and therefore denies these allegations.**

## COUNT I
### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*
### (Against Murphy and Ahalogy)

75.     Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

**ANSWER:**     **Ahalogy re-alleges and incorporates by reference each and every foregoing answer as though set forth fully herein.**

76.     The Defend Trade Secrets Act prohibits the misappropriation of trade secrets.

**ANSWER:**     **Ahalogy admits the allegations contained in Paragraph 76.**

77.     Plaintiffs have developed and own valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce.

**ANSWER:**     **Ahalogy denies the allegations contained in Paragraph 77.**

78.     Those trade secrets are financial, business, scientific, technical, economic, and engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and codes, both tangible and intangible and stored, compiled, and memorialized physically, electronically, graphically, and photographically, and include:

    a.     Customer information, including the identity of current, former, and prospective customers and the identity of and contact information for the decision-makers at the customers;

    b.     Influencer information, including the identity of current, former, and prospective influencers, and the contact information for the influencers;

    c.     Business intelligence and research regarding current, former, and prospective customers, including their marketing and sales strategies; and,

    d.     Information regarding Collective Bias's product offerings (including the design and functionalities of its Shopper Social Media™ platform, Prescriptive IQ™ platform, and Social Fabric® community), positioning in the market, pricing, competitive differentiators, territory and account plans, lead sources, rate cards, budget templates, timeline standards, business opportunities, and research dossiers.

**ANSWER:**     **Ahalogy denies the allegations contained in Paragraph 78.**

79.     This information has value because it is not generally known and is not readily ascertainable. Plaintiffs have spent a significant amount of time and devoted substantial resources to developing this information, and through it Plaintiffs are able to operate and grow their business in a way that is difficult for their competitors to duplicate.

**ANSWER:     Ahalogy denies the allegations contained in Paragraph 79.**

80.     Because this information has value by virtue of its secrecy, and Plaintiffs have taken reasonable measures to keep it secret. Those measures include implementing policies intended to support Plaintiffs' efforts to maintain the secrecy of their trade secrets; limiting access to hardware, software, and physical locations using passwords, keys, key cards, and security personnel; terminating access to confidential information at the conclusion of employment and requiring its return; and procuring nondisclosure, non-solicitation, and noncompetition agreements.

**ANSWER:     Ahalogy denies the allegations contained in the first sentence of Paragraph 80.**

**Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in the second sentence of Paragraph 80, and therefore denies these allegations.**

81.     Defendants have obtained economic benefit from the theft of these trade secrets, including winning new customers based on the unauthorized disclosure and use of the information.

**ANSWER:     Ahalogy denies the allegations contained in Paragraph 81.**

82.     Defendants used improper means to acquire these trade secrets knowing (and having reason to know) that the acquisition was improper. Indeed, despite being obligated to maintain the confidentiality of the information, and after accepting the offer of employment with Ahalogy but before ending her employment relationship with Plaintiffs, Defendant Murphy accessed Plaintiffs' systems without authorization and/or exceeding her authorization, collected this information, and emailed it to her personal email account in order to benefit herself and Ahalogy.

**ANSWER:     Ahalogy denies the allegations contained in the first sentence of Paragraph 82.**

**Ahalogy lacks knowledge sufficient to form a belief to admit or deny as to the allegations contained in the second sentence of Paragraph 82, and therefore denies these allegations.**

83.     As a result of Defendants' unlawful actions, Plaintiffs have suffered harm, including the loss of business and the diminution in value of their confidential information, damaging Plaintiffs in an amount to be determined at trial.

**ANSWER:     Ahalogy denies the allegations contained in Paragraph 83.**

24

<u>COUNT II</u>
**Violation of the Illinois Trade Secrets Act, 765 ILCS 1065 et seq.**
**(Against Murphy and Ahalogy)**

84.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

**<u>ANSWER:</u>    Ahalogy re-alleges and incorporates by reference each and every foregoing answer as though set forth fully herein.**

85.    The Illinois Trade Secrets Act also prohibits the misappropriation of trade secrets.

**<u>ANSWER:</u>    Ahalogy admits the allegations contained in Paragraph 85.**

86.    As a result of Defendants' unlawful actions, Plaintiffs have suffered harm, including the loss of business and the diminution in value of their confidential information, damaging Plaintiffs in an amount to be determined at trial.

**<u>ANSWER:</u>    Ahalogy denies the allegations contained in Paragraph 86.**

<u>COUNT III</u>
**Breach of Contract (Michigan Law)**
**(Against Murphy)**

87.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

**<u>ANSWER:</u>    Count III is not directed to Ahalogy therefore no answer is required.**

88.    A breach of contract occurs under Michigan law (the law by which the parties agreed the Employment Agreement would be governed) where there was a contract which the other party breached thereby resulting in damages to the party claiming a breach.

**<u>ANSWER:</u>    Count III is not directed to Ahalogy therefore no answer is required.**

89.    On or about November 19, 2015, Defendant Murphy and Collective Bias (both of whom were competent to enter into a binding agreement) entered into a valid, enforceable contract when they each signed the Employment Agreement signifying their intent to be bound by the Employment Agreement.

**<u>ANSWER:</u>    Count III is not directed to Ahalogy therefore no answer is required.**

90.     The Employment Agreement was supported by valid consideration. Among other things, and pursuant to the terms of the Employment Agreement (summarized herein), Collective Bias agreed to employ Defendant Murphy in exchange for Defendant Murphy's agreement to:

  a. Maintain the confidentiality of Collective Bias's Confidential or Proprietary Information and its client's confidential information;

  b. At the conclusion of her employment, return to Collective Bias all of Collective Bias's property and all Confidential or Proprietary Information;

  c. At the conclusion of her employment, and for a period of one year thereafter, not directly or indirectly compete with Collective Bias per the terms of the Employment Agreement; and,

  d. At the conclusion of her employment, not directly or indirectly solicit any customer or potential customer of Collective Bias per the terms of the Employment Agreement.

**ANSWER:** **Count III is not directed to Ahalogy therefore no answer is required.**

91.     Defendant Murphy expressly agreed that these restrictions were reasonable and would not preclude her from earning a livelihood.

**ANSWER:** **Count III is not directed to Ahalogy therefore no answer is required.**

92.     Defendant Murphy also agreed that any breach could not reasonably or adequately be compensated in damages in an action at law, and that Collective Bias would be entitled to injunctive relief for any breach.

**ANSWER:** **Count III is not directed to Ahalogy therefore no answer is required.**

93.     These terms of the Employment Agreement survived the termination of Defendant Murphy's employment.

**ANSWER:** **Count III is not directed to Ahalogy therefore no answer is required.**

94.     Notwithstanding the foregoing agreement, and in breach thereof, Defendant Murphy, immediately following the end of her employment relationship with Plaintiffs and before the expiration of one year, began working for Ahalogy—a social media and marketing company that is a direct competitor of Collective Bias-and soliciting the business of customers and potential customers of Collective Bias with whom she had contact or for whose account she worked during the twelve months immediately preceding the termination of the employment relationship.

**ANSWER:** **Count III is not directed to Ahalogy therefore no answer is required.**

95.    In further breach of the Employment Agreement, Defendant Murphy also personally collected, and failed to return to Collective Bias upon the termination of the employment relationship, Collective Bias's property and Confidential or Proprietary Information and its clients' confidential information; delivered and disclosed to Ahalogy the property and information; and employed it for her benefit and the benefit of Defendant Ahalogy rather than for the sole furtherance of the business of Collective Bias.

**ANSWER:    Count III is not directed to Ahalogy therefore no answer is required.**

96.    As a direct result of these breaches of the Employment Agreement, Plaintiffs have suffered harm, including the loss of business and the diminution in value of the Confidential or Proprietary Information, damaging Plaintiffs in an amount to be determined at trial.

**ANSWER:    Count III is not directed to Ahalogy therefore no answer is required.**

## COUNT IV
### Breach of Contract (North Carolina Law) (Against Murphy)

97.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

**ANSWER:    Count IV is not directed to Ahalogy therefore no answer is required.**

98.    A breach of contract occurs under North Carolina law (the law by which the parties agreed the CAPRAA would be governed) where there is a valid contract and that contract is breached.

**ANSWER:    Count IV is not directed to Ahalogy therefore no answer is required.**

99.    On or about December 27, 2016, Defendant Murphy and Inmar (both of whom were competent to enter into a binding agreement) entered into a valid, enforceable contract when on December 23, 2016 and December 27, 2016 they each respectively signed the CAPRAA signifying their intent to be bound by the CAPRAA.

**ANSWER:    Count IV is not directed to Ahalogy therefore no answer is required.**

100.    The CAPRAA was supported by valid consideration. Among other things, and pursuant to the terms of the CAPRAA (summarized herein) Inmar agreed to employ Murphy and make available to her all the additional benefits of being employed by Inmar in exchange for Defendant Murphy's agreement to:

      a.    Maintain the confidentiality of Plaintiffs' Confidential Information and third parties' confidential information;

b. At the conclusion of her employment, return to Plaintiffs all of their property and all Confidential Information;

c. Abide by her duty of loyalty to Plaintiffs;

d. Abide by the terms of the non-compete;

e. Abide by the terms of the non-solicitation.

**ANSWER:** **Count IV is not directed to Ahalogy therefore no answer is required.**

101. Defendant Murphy expressly agreed that these restrictions were reasonable.

**ANSWER:** **Count IV is not directed to Ahalogy therefore no answer is required.**

102. Defendant Murphy also agreed that any breach of the CAPRAA could not reasonably or adequately be compensated in damages in an action at law, and that Inmar would be entitled to injunctive relief for any breach.

**ANSWER:** **Count IV is not directed to Ahalogy therefore no answer is required.**

103. These terms of the CAPRAA survived the termination of Defendant Murphy's employment.

**ANSWER:** **Count IV is not directed to Ahalogy therefore no answer is required.**

104. Notwithstanding the foregoing agreement, and in breach thereof, Defendant Murphy, immediately following the end of her employment relationship with Plaintiffs and before the expiration of two years, began (i) working in Chicago for Ahalogy and (on information and belief) receiving stock in Ahalogy—a company that conducts a business of a like or similar nature to the business services engaged in by Plaintiffs-in the same or substantially similar capacity in which she worked for Plaintiffs, and (ii) soliciting the business of customers and prospective customers of Plaintiffs with whom she had contact during the twelve months immediately preceding the termination of the employment relationship.

**ANSWER:** **Count IV is not directed to Ahalogy therefore no answer is required.**

105. In further breach of the CAPRAA, Defendant Murphy also personally collected and failed to return to Plaintiffs upon the termination of the employment relationship Plaintiffs' property and Confidential Information and confidential information of third parties; delivered and disclosed to Ahalogy that property and information; and employed it for her benefit and the benefit of Defendant Ahalogy rather than for the sole furtherance of the business of Plaintiffs.

**ANSWER:** **Count IV is not directed to Ahalogy therefore no answer is required.**

106.    Defendant Murphy also violated her duty of loyalty by engaging in the conduct described above.

**ANSWER:** **Count IV is not directed to Ahalogy therefore no answer is required.**

107.    As a direct result of these breaches of the CAPRAA, Plaintiffs suffered harm, including the loss of business and the diminution in value of the Confidential Information, damaging Plaintiffs in an amount to be determined at trial.

**ANSWER:** **Count IV is not directed to Ahalogy therefore no answer is required.**

## COUNT V
### Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*
### (Against Murphy and Ahalogy)

108.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

**ANSWER:** **Ahalogy is not required to provide an answer to Count V, as this claim has been dismissed by the Court.**

109.    The Computer Fraud and Abuse Act prohibits unauthorized access of protected computers.

**ANSWER:** **Ahalogy is not required to provide an answer to Count V, as this claim has been dismissed by the Court.**

110.    As described above, Plaintiffs provided Defendant Murphy with a computer, an email account, and access to Plaintiffs' facilities and other computers for use in the performance of her employment. That computer, email account, and access provided access to worldwide communications through applications accessible via the internet.

**ANSWER:** **Ahalogy is not required to provide an answer to Count V, as this claim has been dismissed by the Court.**

111.    Defendant Murphy used that computer, email account, and access to work and communicate with clients and prospective clients located across the country, as well as work and

29

communicate with Plaintiffs' other employees also located across the country (including in Illinois, in Arkansas, and in North Carolina) and to access Plaintiffs' interstate computer network and servers on which files were stored.

**ANSWER:** **Ahalogy is not required to provide an answer to Count V, as this claim has been dismissed by the Court.**

112.    As detailed above, Defendant Murphy agreed in the Employment Agreement and CAPRAA to return Plaintiffs' property at the conclusion of her employment, maintain the confidentiality of the Confidential or Proprietary Information and Confidential Information, and not access or use the information except in the course of her employment for the benefit of Plaintiffs. Defendant Murphy also owed Plaintiffs a duty of loyalty. Defendant Murphy's use of her computer and email account and access to facilities and other computers was limited by these obligations.

**ANSWER:** **Ahalogy is not required to provide an answer to Count V, as this claim has been dismissed by the Court.**

113.    Defendant Murphy, however intentionally used her computer, email account, and Plaintiffs' facilities and other computers for a different purpose (which she accomplished): to obtain Plaintiffs' Confidential or Proprietary Information and Confidential Information for her own enrichment and that of Defendant Ahalogy. That access therefore was intentional, without authorization, and/or exceeded her authorized access.

**ANSWER:** **Ahalogy is not required to provide an answer to Count V, as this claim has been dismissed by the Court.**

114.    These actions caused damage and loss. The loss includes the cost of responding to the Defendants' unlawful actions and conducting damage assessment, which is ongoing and will exceed $5,000 well before the expiration of a one year period.

**ANSWER:** **Ahalogy is not required to provide an answer to Count V, as this claim has been dismissed by the Court.**

115.    Defendant Ahalogy conspired with Defendant Murphy in the commission of these unlawful acts.

**ANSWER:** **Ahalogy is not required to provide an answer to Count V, as this claim has been dismissed by the Court.**

116.    Defendants therefore violated 18 USC §§ 1030(a)(2)(C), (a)(5)(C), and (b), damaging Plaintiffs in an amount to be determined at trial.

**ANSWER:    Ahalogy is not required to provide an answer to Count V, as this claim has been dismissed by the Court.**

## COUNT VI
### Tortious Interference with Contract
### (Against Ahalogy)

117.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

**ANSWER:    Ahalogy re-alleges and incorporates by reference each and every foregoing answer as though set forth fully herein.**

118.    As detailed above, valid contracts existed between Plaintiffs and Defendant Murphy.

**ANSWER:    Ahalogy denies the allegations contained in Paragraph 118 of the Complaint.**

119.    Defendant Ahalogy was aware of these contracts, but nevertheless hired Defendant Murphy with the knowledge and intent that Defendant Murphy would breach those contracts as its new Director of Sales.

**ANSWER:    Ahalogy denies the allegations contained in Paragraph 119 of the Complaint.**

120.    As detailed above, Defendant Murphy did breach those contracts, damaging Plaintiffs in an amount to be determined at trial.

**ANSWER:    Ahalogy denies the allegations contained in Paragraph 120 of the Complaint.**

## COUNT VII
### Conversion
### (Against Murphy and Ahalogy)

121.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

**ANSWER:** **Ahalogy is not required to provide an answer to Count VII, as this claim has been dismissed by the Court.**

122.    As detailed above, Defendant Murphy agreed in the Employment Agreement and CAPRAA to return Collective Bias's property at the conclusion of her employment, maintain the confidentiality of the Confidential or Proprietary Information and Confidential Information, and not access or use the information except in the course of her employment for the benefit of Plaintiffs.

**ANSWER:** **Ahalogy is not required to provide an answer to Count VII, as this claim has been dismissed by the Court.**

123.    As also detailed above, Defendant Murphy, without authorization and/or exceeding her authorization, obtained and failed to return Plaintiffs' property and Confidential or Proprietary Information and Confidential Information for her own enrichment and that of Defendant Ahalogy.

**ANSWER:** **Ahalogy is not required to provide an answer to Count VII, as this claim has been dismissed by the Court.**

124.    Plaintiffs had a right to the property and Confidential or Proprietary Information and Confidential Information, and an unconditional right to the immediate possession of it.

**ANSWER:** **Ahalogy is not required to provide an answer to Count VII, as this claim has been dismissed by the Court.**

125.    By obtaining, using, and disclosing the property and information, the value of it has already diminished such that its return would not alleviate Plaintiffs' loss, damaging Plaintiffs in an amount to be determined at trial.

**ANSWER:** **Ahalogy is not required to provide an answer to Count VII, as this claim has been dismissed by the Court.**

## COUNT VIII
**Trespass to Chattels**
**(Against Murphy and Ahalogy)**

126.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

32

**ANSWER:**    Ahalogy is not required to provide an answer to Count VIII, as this claim has been dismissed by the Court.

127.    By obtaining and failing to return Plaintiffs' property and Confidential or Proprietary Information and Confidential Information and instead using it for their own enrichment, Defendants dispossessed Plaintiffs of the property and Confidential or Proprietary Information and Confidential Information (because once used and disclosed, it no longer had the value it did before Defendants' unlawful actions), damaging Plaintiffs in an amount to be determined at trial.

**ANSWER:**    Ahalogy is not required to provide an answer to Count VIII, as this claim has been dismissed by the Court.

## COUNT IX
### Unjust Enrichment
### (Against Murphy and Ahalogy)

128.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

**ANSWER:**    Ahalogy is not required to provide an answer to Count IX, as this claim has been dismissed by the Court.

129.    By virtue of having collected and used Plaintiffs' property and Confidential or Proprietary Information and Confidential Information, Defendants unjustly retained a benefit to the detriment of Plaintiffs, and that retention violates fundamental principles of justice and equity.

**ANSWER:**    Ahalogy is not required to provide an answer to Count IX, as this claim has been dismissed by the Court.

130.    In so doing, Defendants dispossessed Plaintiffs of the property and Confidential or Proprietary Information and Confidential Information (because once used and disclosed, it no longer had the value it did before her unlawful actions), damaging Plaintiffs in an amount to be determined at trial.

**ANSWER:**    Ahalogy is not required to provide an answer to Count IX, as this claim has been dismissed by the Court.

## COUNT X
## Civil Conspiracy
## (Against Murphy and Ahalogy)

131.     Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph as though set forth fully herein.

**ANSWER:     Ahalogy is not required to provide an answer to Count X, as this claim has been dismissed by the Court.**

132.     When, as detailed above, Defendants met and had discussions regarding hiring Defendant Murphy for the role of Director of Sales, they formed an agreement to undertake all of the foregoing unlawful conduct.

**ANSWER:     Ahalogy is not required to provide an answer to Count X, as this claim has been dismissed by the Court.**

133.     The foregoing unlawful conduct (such as Defendant Murphy accessing Plaintiffs' systems to obtain Plaintiffs' property and Confidential or Proprietary Information and Confidential Information for Defendants' use) was taken in furtherance of that agreement.

**ANSWER:     Ahalogy is not required to provide an answer to Count X, as this claim has been dismissed by the Court.**

134.     Plaintiffs have been damaged as a result in an amount to be determined at trial.

**ANSWER:     Ahalogy is not required to provide an answer to Count X, as this claim has been dismissed by the Court.**

WHEREFORE, Defendant Ahalogy respectfully requests that this Court deny all of the relief Plaintiffs have requested, enter judgment in favor of Defendant on all counts of the Complaint, and grant any further or relief that the Court deems just and proper.

## JURY TRIAL DEMANDED

Defendant requests a trial by jury of all issues so triable.

34

## ADDITIONAL OR AFFIRMATIVE DEFENSES

Without admitting or conceding any matter, Ahalogy asserts the following defenses in response to the allegations of the Complaint, and without accepting the burden of proof on any matter unless the law providing for the defense actually places the burden on a defendant. As the factual basis for these affirmative defenses, Ahalogy refers to and incorporates herein as applicable the allegations of Ahalogy's answers and denials as set forth in its Answer to Plaintiffs' Complaint.

## FIRST DEFENSE
### (Prior material breach)

1.      Plaintiffs are precluded from bringing any claims based upon their material breach of the CAPRAA, and are likewise precluded from suing Ahalogy on that basis when they themselves have not complied with the agreement. Upon information and belief, as an inducement for Defendant Murphy to sign one or more restrictive covenants, Plaintiffs informed Defendant Murphy at the time of her signature that only a specific list of companies were considered competitors covered by the non-compete in the CAPRAA.

2.      Specifically on November 30, 2016, Angelique O'Bryan, Director of Human Resources and Operations, sent an email to all Collective Bias employees stating: "Many of you have asked for this direct competitor list to reference when reviewing the CAPRAA document that Inmar provided. Please review and let me know if you have any questions!" Ahalogy was not on the attached list of competitors.

3.      Upon information and belief, Defendant Murphy was induced by this representation to agree to the restrictive covenants in these agreements and notwithstanding Plaintiffs' representation, Plaintiffs sued Defendant Murphy and thereby materially breached the terms of her agreement with Plaintiffs. As a result, Plaintiffs are precluded from enforcing the

restrictive covenants in these agreements against Defendant Murphy and therefore are precluded from bringing interference claims against Ahalogy.

## SECOND DEFENSE
### (Unclean Hands)

4.     Plaintiffs are precluded from enforcing any of their claims based upon the doctrine of unclean hands, and based upon the same facts as stated in Affirmative Defense 1.

## THIRD DEFENSE
### (Collective Bias Agreement as Unenforceable as Against Public Policy)

5.     Plaintiffs' attempt to enforce the restrictive covenants in the Collective Bias Agreement violates the public policy of Illinois, as these covenants are unreasonable, vague and unenforceable restraints on trade.  Illinois disfavors the enforcement of restrictive covenants with other state choice of law clauses, where the covenants violate the public policy of Illinois.

## FOURTH DEFENSE
### (Failure to Mitigate)

6.     Plaintiffs have failed to mitigate any alleged damages they have suffered as a result of any alleged interference on the part of Ahalogy.

7.     Upon information and belief, Plaintiffs knew of Defendant Murphy's employment with Ahalogy shortly after she started but neglected to take any action to advise Defendant Ahalogy of its alleged claims for nearly eight months after Defendant Murphy began her employments with Ahalogy.

8.     To the extent Plaintiffs suffered any actual harm or damage during those nearly eight months, Ahalogy cannot be held responsible as it was unaware of Plaintiffs claims that Defendant Murphy was in violation of any agreement or that she still possessed alleged trade secret information.

**FIFTH DEFENSE**
**(Collective Bias Agreement Unenforceable as Superseded by CAPRAA)**

9.      The Collective Bias Agreement was superseded by the express terms of the CAPRAA and is no longer enforceable as a matter of law.  The parties contemplated that upon the signing of the CAPRAA, the Collective Bias Agreement would no longer be enforceable as a matter of law and would be the "entire agreement" between Plaintiffs and Defendant Murphy.

10.      Therefore, Plaintiffs' claims based upon the Collective Bias Agreement are unenforceable against Defendant Murphy and are thereby incapable of being interfered with by Ahalogy.

**SIXTH DEFENSE**
**(Collective Bias Agreement Unenforceable Due to Lack of Consideration)**

11.      The Collective Bias Agreement is not supported by any adequate consideration provided to Defendant Murphy at the time of her purported signature to these agreement.  As a result, none of the restrictive covenants contained in the Collective Bias Agreement are enforceable as a matter of law.

12.      Therefore, Plaintiffs' claims based upon the Collective Bias Agreement are unenforceable against Defendant Murphy and are thereby incapable of being interfered with by Ahalogy.

**SEVENTH DEFENSE**
**(Collective Bias Agreement Unenforceable as to Injunctive Relief Due to Expiration of Time Period in Restrictive Covenant)**

13.      Plaintiffs are precluded from seeking any injunctive relief against Defendants based upon the fact that the restrictive covenants period in the Collective Bias Agreement have expired, and Plaintiffs have never moved for any preliminary injunctive relief prior to the expiration of these covenants.  Thus, to the extent that the Collective Bias Agreement is enforceable, Plaintiffs' right to seek injunctive relief based upon this contract has expired under the terms of the contract.

## EIGHTH DEFENSE
### (Laches and/or Unreasonable Delay)

14.     Plaintiffs' claims are precluded based upon the doctrine of laches and/or unreasonable delay.  Plaintiffs waited nearly eight months after Defendant Murphy resigned, and after Plaintiffs have knowledge that Defendant Murphy was hired by Ahalogy, before Plaintiffs brought this litigation.  Plaintiffs' unreasonable delay in bringing this lawsuit precludes their claims.

Dated: January 14, 2019

Respectfully submitted,

MLW SQUARED, INC., d/b/a AHALOGY

By:   */s/ Carrie A. Hall*
        One of Defendant MLW Squared, Inc.,
        (d/b/a Ahalogy) attorneys

Carrie A. Hall (ARDC #6269884)
cahall@taftlaw.com
Daniel R. Saeedi (ARDC #6296493)
dsaeedi@taftlaw.com
Zachary R. Clark (ARDC #6328816)
zclark@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone: 312-527-4000

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 14, 2019, I caused a true and correct copy of the foregoing to be filed on the Court's CM/ECF system, which served notice on all counsel of record.

By:  */s/ Carrie A. Hall*